

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-10-00001-CV

_____

KEITH HATHCOCK, INDIVIDUALLY AND AS SOLE SURVIVING HEIR
OF HUNTER HATHCOCK, DECEASED, AND ON BEHALF OF THE
ESTATE OF HUNTER HATHCOCK, AND AS NEXT FRIEND
OF ALEXA HATHCOCK, A MINOR, Appellant

V.

HANKOOK TIRE AMERICA CORPORATION, AND
HANKOOK TIRE CO., LTD., Appellees

On Appeal from the 354th Judicial District Court
Hunt County, Texas
Trial Court No. 69778

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss
Concurring Opinion by Justice Carter

OPINION

In August 2004, Emily Roddy was driving at highway speed in a late model pickup truck on which had been mounted in the left front position a model Z36, load range C, light truck radial tire manufactured in 1997. On board were her children, Alexa and Hunter Hathcock. The tire "bl[e]w out the side," causing Roddy to lose control of her vehicle and hit a tree, to devastating results. Roddy died at the scene of the accident, seven-year-old Hunter passed away at the hospital, and five-year-old Alexa survived with debilitating injuries.

The tragedy resulted in claims of defective design and manufacture against manufacturer Hankook Tire America Corporation and Hankook Tire Company Limited (collectively, Hankook) filed by the children's father, Keith Hathcock (Hathcock). At trial, Hathcock's expert Troy Cottles espoused several design-defect theories, including the absence of a nylon cap ply, a narrow top steel belt, a thin belt wedge, and inadequate skim stock. As to the claimed manufacturing defect, Cottles claimed the tire contained trapped air and had steel belt irregularities and poor bonding, as evidenced by stress risers, oxidative degradation, rubber reversion, and linear patterns. Hankook's defense was that the tire was seven years old, had been chronically underinflated, and had sustained a "dramatic" impact 2,000 to 3,000 miles before the accident. After a four-week trial, Hankook won the jury's verdict.

Hathcock complains on appeal that the evidence was factually insufficient to support the jury's verdict that there was no manufacture or design defect. He also argues that the trial court

2

erred in excluding evidence of "use of nylon cap plies in non-speed rated tires," of government regulations enacted after the tire was made, and of a comparison of the tire's defects to defects found in Firestone tires. Hathcock also suggests the trial court erred in admitting testimony of two of Hankook's allegedly untimely designated witnesses and in allowing testimony from the publication "The Pneumatic Tire," sponsored by the National Highway Traffic and Safety Administration.

We affirm the judgment of the trial court, because (1) factually sufficient evidence supports the verdict; the trial court was within its discretion in (2) excluding evidence regarding nylon cap plies, (3) excluding evidence regarding FMVSS 139, (4) excluding evidence regarding Firestone tires, (5) admitting testimony from Hankook's timely designated witnesses; and (6) no error appears regarding evidence from the publication "The Pneumatic Tire."

*(1)     Factually Sufficient Evidence Supports the Verdict*

When considering a factual sufficiency challenge to a jury's verdict, we must consider and weigh all of the evidence, not just that evidence which supports the verdict. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (citing *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998)). We will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Id.* (citing *Ellis*, 971 S.W.2d at 407; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). Because we are not a fact-finder, we will not pass on the witnesses' credibility or substitute our judgment for the jury's, even if the evidence

3

would clearly support a different result.   *Id*. (citing *Ellis*, 971 S.W.2d at 407).

Accident reconstructionist Danny Phillips testified that the tragedy was caused by the "disablement" of the left front tire.   He confirmed that Roddy was travelling under the speed limit of seventy miles per hour.

The detreaded Hankook tire was a model Z36, load range C, light truck, high flotation radial tire[1] manufactured in 1997 in Daejeon, Korea.   The first claimed design defect discussed by expert Cottles was lack of a nylon cap ply, which "is a nylon layer that would be the last layer on the tire before the tread that's really meant to hold all the rest of the tire all together."   Cottles explained that, if the belts are wrapped in nylon:

> it'll resist so that when you cure the tire, it shapes up in a mold it's already intentioned and there are a lot of patents on that that talk about pretensioning the belts with the nylon.   So that throughout the use of the tire, whatever range of speed you're using, this is helping cinch the belts down and keep them from wanting to fly loose from each other.

Cottles did not claim that every tire without a nylon cap ply was defective, but that,   "[i]f [the] tire's going to fail in tread separation mode without a nylon cap ply, then the technology of nylon cap plies is known in the industry to improve that performance."   He testified before the jury that the nylon cap ply was a technology available in 1997 and was economically feasible, since the cost would be between thirty cents to one dollar per tire.

Next, Cottles criticized belt irregularities.   He testified:

---

[1]The anatomy of the tire consists roughly of an inner liner, beads, polyester radial body plies, skim stock rubber sheet, steel belt #1, belt wedge, skim stock rubber sheet, steel belt #2, and tire tread.

4

Items that I saw here that I'm critical of from design of the tire are that the top belt is very narrow to the contacting area of the tire. Sort of from my training design 101 is you want this top belt to basically take up all of the stress and strain that can cause flex and heat stress and strain out at the shoulders. So, you want that belt to encompass the contacting area or the width of the tire.

Cottles claimed that a safer alternative design would have included a wider top belt. He also told the jury that the tire had inadequate skim stock and that a thicker belt wedge would improve durability by "dissipat[ing] the heat stress and strain that occurs at the belt edges, which is the highest area of heat stress and strain in most tires."

As for manufacturing defects, Cottles "noted that trapped air was in the presence of that belt skim from the time it was manufactured." He explained that the "oxidative degradation of the belt skim between the two belts" was evidence that "the bond has failed in an area of the tire which makes it weaker and more susceptible to separate." The oxidation occurred, he said, also in part due to inadequacy of the skim stock, which contained "enough antioxidant in it to sustain it and let it wear out before that occurred." Cottles testified that a gap in the belt splice was, according to testimony of Hankook witness Eun Pyo Hong, an irregularity that did not meet specification standards. Cottles believed that the tire was improperly cured because, "If you pulled something apart that's been properly cured, you'd have a random tear structure to the tear. Here, this comes off and there's no tear." He concluded, "The tire is defective by both manufacturing and design defects."

Hankook's strategy was to focus on the condition of the seven-year-old tire. Roddy's

5

husband, Marion Shane Roddy, had owned the truck four months before the accident. He testified that, to make sure "none of the tires were low," "I just walked by and kicked the tires. I never just put a gauge on it." He knew nothing of the condition of the tires before he inherited the truck from his father.

Raymond Labuda, vice president of technology for Akron Technical Center of Hankook Tire, determined—from "the bead shaping [which was] pretty pronounced," the amount of "rim grooving," and the condition of the remaining tread—that the tire suffered from chronic underinflation.[2] He explained that underinflation increases the tire's surface area on the road, building up additional friction and heat, and causing degradation in the rubber, leading to belt separation.

To counter Hankook's position, Cottles testified, "In a properly manufactured and designed tire I wouldn't expect to see underinflation lead to a tread separation." Severe underinflation, said Cottles, would likely lead to a sidewall failure different from the tread separation experienced in the tire at issue.

Hankook also asserted the tire was generally worn. The original tread depth of the tire was 16/32. Hankook's experts testified that parts of the tread were at a depth of 3/32, with 2/32 being the legal minimum in Texas. Daejeon plant manager Hong said:

> I looked at the photo of the accident tire and from looking at it, I saw that the tire
> was badly worn out and above it and in the general usage of a tire, I saw some

---

[2]The tires were meant to operate at a pressure of fifty psi. According to Labuda, they operated chronically at thirty-five psi or below.

damages, so scratch—damages that—on the tire that's above and beyond a normal—what you expect to see from normal usage and, therefore, I don't think there was any manufacturing defects related to that.

Hankook expert Joseph Lawrence Grant saw the damage referred to by Hong, including a deep small penetration in the tire and cracks emerging from it, and opined that the tire failed because of a localized road hazard impact, in addition to underinflation.[3] A big abrasion mark close to the radial split led him to believe "it's pretty obvious the tire is failing in a—kind of a localized area." Examining further, Grant noticed "a small bend in the wheel flange right here. It's real easy to see that something dinged it on the outside, and you can also see that the polishing changes in contour a little bit," evidence of a "preexisting bend on the wheel" caused by something "dramatic" "going roughly 2,000 or 3,000 miles back from the point of when the tire disablement occurred."

During cross-examination, Cottles admitted that there were six wear bars across the surface of the tire, as well as cracks possibly created by thorns or stones. The tread covering the area where the separation occurred was missing during the time of trial, evidence that Cottles would want to examine to eliminate other possible causes of the accident.

Hankook discounted each of Cottles' design and manufacturing defect theories. As to the issue of nylon cap ply, Labuda emphasized that, along with Cottles, he was unaware of any load range C light truck tire that was manufactured with nylon cap plies in 1997. Hankook's experts

---

[3]Grant also stated continued operation of a tire that's substantially underinflated or flat will result in wrinkles or marbling not found in the subject tire.

testified nylon cap plies were needed only in high-speed rated tires, and would have contributed nothing to the detreaded tire involved in the seventy-mile-per-hour accident. With respect to belt irregularities, Grant and Labuda testified the belt wedge strip did not absorb heat, and Cottles' suggestion that a thicker belt wedge would improve performance was therefore incorrect. Grant also challenged Cottles' conclusion that the top belt should be widened:

> Well, as I understand his design defect, he's saying that it should be a 1 to 1 ratio of the tread width and the top steel belt width in order to reduce the stresses and the strains on the belt edges and to minimize belt edge separation. That's basic tire 101. He's absolutely 100 percent wrong on that just very basic tire engineering concepts. If you want to reduce the stresses and the strains on the belt edges, and if that's a design consideration for you, actually reduce the belt widths. The narrower you make them, the more you take them out of that area of high stresses and strains at the belt edges, where all that thickness and heat is.

The experts rebutted Cottles' assessment of symptoms indicating manufacturing defects. Grant and Labuda added that there was no trapped air in the tire because it was eliminated in the assembly room, the belt wires were not overlapped, nothing in the bonding contributed to the detread, and there were no stress risers. They denied oxidative degradation had occurred due to the resiliency in the rubber component remaining on the detreaded tire, thereby countering theories that the belt skim was inadequate due to insufficient antioxidant amounts. While there was a gap in the belt splice, Labuda stated the gap was part of a proper "butt splice" used in the tire, and professed that the alleged belt scalloping was a normal part of the production process. Grant explained that "[r]ubber revision is a thermal process. It's a heat degradation of rubber where the rubber gets to the point where it actually starts to revert back to its natural state. It becomes very

soft and gooey. We don't have any rubber reversion in this tire." The experts clarified "linear patterns are what you'd expect to find in any well-manufactured tire because of the random tearing of the rubber as you rip open the structure" during an accident. In sum, they presented contrary evidence to all of Cottles' theories.

Last, after the jury heard that Hathcock had sued Roddy for negligence, accident reconstructionist Richard Schlueter testified that, contrary to advice in the "Texas Drivers' Handbook," Roddy "put heavy brake force on that pedal" and caused the brakes to "lock up." This theory was rebutted by Phillips, who confirmed that Roddy had approximately two and one-half seconds to react to the disablement before hitting the tree and that she slammed on the brakes due to oncoming traffic. Phillips concluded Roddy was not negligent.

Faced with a battle of experts, the jury was free to believe Hankook's theory of underinflation or localized impact. The jury was able to view the detreaded tire in the courtroom and could visually assess the credibility of Hankook's arguments as to general age, wear, or neglect of the tire. Due to knowledge of Hathcock's prior negligence suit against Roddy, they may have also concluded Roddy was negligent. The jury could have discounted Cottles, Hathcock's only expert on design and manufacture defect, since he agreed that a full examination of the tire could not be conducted due to the missing tire tread. Moreover, Cottles had been fired from his last job at Goodyear Dunlop and "immediately went into the consulting business." He had applied for a job at Hankook and was turned down because "his engineering fundamentals

9

were weak," facts which the jury may have determined gave Cottles motivation to be overly critical of Hankook tires. After examination of the record above, we hold that the jury's verdict was not so contrary to the overwhelming weight of the evidence that it was clearly wrong and unjust. Therefore, we find the evidence factually sufficient to support it.

*(2)* *The Trial Court Was Within Its Discretion in Excluding Evidence Regarding Nylon Cap Plies*

The admission or exclusion of evidence is a matter within the sound discretion of the trial court. *Daniels v. Yancey*, 175 S.W.3d 889, 895 (Tex. App.—Texarkana 2005, no pet.) (citing *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995)). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *Holtzman v. Holtzman*, 993 S.W.2d 729, 734 (Tex. App.—Texarkana 1999, pet. denied) (citing *Downer v. Aquamarine Operators*, 701 S.W.2d 238, 241–42 (Tex. 1985)).

Hathcock asserts the trial court "erred in excluding evidence related to the use of nylon cap plies in non-speed-rated tires," even though Cottles testified that he used nylon cap plies in later designs of non speed-rated tires.[4] Hathcock's main arguments are that the jury was deprived of:

> (1) the fact that many light truck tires manufactured and sold today have nylon cap plies; (2) the fact that Hankook actually added a nylon cap ply to the subject tire sometime after the tire at issue was manufactured; and (3) the fact that the federal standard that forced Hankook to add a nylon cap ply to the subject tire only tested tires at speeds below 100 miles per hour.

We will review for abuse of discretion the trial court's decision in excluding evidence of the use of

---

[4]Grant also testified nylon cap plies can be used in "even lower speed rated tires if there's a need to use nylon in order to get the speed capability that you're looking for."

nylon cap plies today, the subsequent change in governmental regulation relative to nylon cap plies, and the subsequent addition of nylon cap plies to the Hankook tire. *See id.*

Complaining that the trial court improperly limited cross-examination, Hathcock points this Court to the following exchange with Hankook's expert Grant:

> Q.     [By Pearson]   And it's your testimony that nylon cap plies are primarily beneficial for high-speed tires; is that right?
>
> A.     [By Grant]   Primarily that's where they're used; but as I said, you can use them in lower speed rating situations.
>
> Q.     And what use would they have in lower speed rated situations?
>
> A.     They improve the high-speed capability of any tire.   Any tire that has a –typically will have a[n] internal high-speed requirement and if you—sometimes you would use nylon in order to achieve that high-speed capability.
>
> Q.     Now, the truth is there are millions of off-road light truck tires, just like the tire that failed there, on the road today that have nylon cap plies, correct?
>
> A.     I don't know that.   I don't know what the number is.   There's millions without and there's a large number with, but I don't know what the numbers are.
>
> Q.     Including my Chevy Tahoe sitting out here outside --
>
> Mr. Ezzell:           Your Honor --
>
> Q.   (By Mr. Pearson) -- the courtroom?
>
> Mr. Ezzell:           Your Honor, I'll object to relevance, foundation, Rule 403.
>
> THE COURT:           All right.   I'll sustain as to what's on your tire.
>
> Q.     [By Mr. Pearson] Well, you know what's on a Chevy Tahoe because you've

11

got one, don't you.

A.      Not anymore; but I did, yes.

Q.      And it had nylon cap plies in that tire, didn't it?

A.      No, it did not.

After this answer was given, a discussion was held at the bench.   When faced with the decision of whether to allow testimony of the existence of nylon cap plies in truck tires today, the trial court ruled, "What today's tires are, I'm going to rule as irrelevant to what they were in 1997." Hathcock claims that the court erred in this ruling because the information was relevant to his claims of safer alternative design.

Chapter 82 of the Texas Civil Practice and Remedies Code addresses products liability, and places the burden of establishing design defect through a safer alternative design on the plaintiff by a preponderance of the evidence.   TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a) (Vernon 2005).   The Code explains:

> "[S]afer alternative design" means a product design other than the one actually used that in reasonable probability:  (1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and (2) was economically and technologically feasible *at the time the product left the control of the manufacturer or seller* by the application of *existing or reasonably achievable* scientific knowledge.

TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(b) (Vernon 2005) (emphasis added).   Rule 401 of the Texas Rules of Evidence defines relevant evidence as "evidence having any tendency to make

12

the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Rule 402 provides that evidence which is not relevant is inadmissible. TEX. R. EVID. 402.

While the addition of a nylon cap ply may have prevented injury, Hathcock did not demonstrate why evidence of the way tires are manufactured twelve years after the tire's manufacture would be relevant to the feasibility of adding nylon cap plies in 1997.[5] Therefore, we conclude that the trial court acted within its discretion in disallowing the proffered evidence.[6]

At the time the tire was manufactured, it was required to meet Federal Motor Vehicle Safety Standard (FMVSS) 119, which included a high-speed test, endurance test, "bead push off test for dislodging the tire from the rim and a plunger test where you plunger through the carcass of the tire and the carcass has to have a certain resistance to that plunger." Some years later, FMVSS 119[7] was replaced by a more stringent standard, FMVSS 139.[8]

---

[5] Hathcock cites *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328 (Tex. 1998). In that case, the court found admissible testimony that competitors were already using the safer alternative design and the fact that the company switched to the safer alternative design one year after the accident as evidence of its feasibility. *Id.* at 337. In this case, Grant testified that the Chevy Tahoe tires did not have a nylon cap ply. Hankook was the only other manufacturer mentioned during this exchange as a company who had included nylon cap plies years after the tire's manufacture in response to new government regulations. *Uniroyal* is distinguished from this case because Cottles could not name a manufacturer who was using nylon cap plies in load range C tires around 1997, and Hankook's switch to nylon cap plies years after the tire's manufacture could not establish evidence of feasibility in 1997.

[6] Hathcock cites cases which held information that other manufacturers were using a safer alternative design was relevant, even if occurring shortly after the allegedly defective product's manufacture. Here, there is no offer of proof in the record suggesting that any other manufacturer was using nylon cap plies in light truck, load range C tires close to the 1997 time frame.

[7] FMVSS 119 was created at a time where most tires on the market were bias ply, as opposed to radial ply tires.

Nevertheless, Hathcock complains that the trial court erred in excluding evidence of Hankook's latter addition of nylon cap plies to the Z36 model tire. The date of the addition was also not established in the record, with one expert stating in a 2009 deposition that the nylon cap ply was added "fairly recently," and another claiming "[Hankook] started to apply some of the nylon applications over the past five or six years."[9] Both parties treated the addition of the nylon cap ply as a subsequent remedial measure. Specifically, Hathcock alleged that a nylon cap ply was added to the tire in order to meet FMVSS 139 and argued that the jury be presented with this evidence at a hearing on Hankook's motion in limine to establish feasibility of a safer alternative design. We examine these claims as raised.

Rule 407(a) of the Texas Rules of Evidence reads:

> (a) Subsequent Remedial Measures. When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent remedial measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction.

---

[8]The record is unclear regarding the effective date of FMVSS 139. At one point, the record stated "in 2001 or 2002, 119 was changed to become 139," and at another point, it was averred that the new standard "didn't come into being until 2006 or 2007." Deposition testimony implied that "[i]t was certainly in 2001 or 2002, was the first indication of a proposal for a new standard. There was a series of proposed rule makings issued by NHTSA, and that process took place between 2002 and, I believe, roughly 2005 with the final implementation ruling being . . . around Septemberish 2007." It would seem that FMVSS 139 was proposed in 2002 and established as a final rule by the NHTSA in November of that year, to be effective September 1, 2003. 67 Fed. Reg. 69,600-01 (Nov. 18, 2002). Based on petitions for reconsideration of the rule, however, the effective date of FMVSS 139 was postponed first to September 1, 2004, and then to September 1, 2005. 68 Fed. Reg. 33,655-01 (June 5, 2003); 69 Fed. Reg. 31,306-01 (June 3, 2004). The standard was first codified in 2005, and modified several times thereafter to push the final effective date to September 1, 2007. 49 C.F.R. § 571.139 (2008); 71 Fed. Reg. 877-02 (Jan. 6, 2006); 67 Fed. Reg. 69,600 (Nov. 18, 2002). The accident in this case occurred in 2004, several years before FMVSS 139 became effective.

[9]Arguments of counsel stated the "nylon was added in 2007."

14

This rule does not require the exclusion of evidence of subsequent remedial measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

To support the contention that "the feasibility exception to Rule 407 applied" to allow evidence of the latter addition of nylon cap plies, Hathcock cites to several federal cases that either do not apply or contain fact patterns where a subsequent remedial measure was employed by manufacturers shortly after the plaintiffs' accidents.[10]  When it comes to defective design, the feasibility of a precautionary measure contains a temporal element.  Here, FMVSS 139 did not become effective until well after the plaintiff's accident, and there is no evidence in the record establishing the date the nylon cap ply was added.  The trial court was free to conclude the feasibility exception did not apply since there was no testimony or other evidence demonstrating that the addition of the nylon cap ply, at some point after the accident, could establish the feasibility of a safer alternative design in 1997.

---

[10]*See Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 240 (5th Cir. 2003) (subsequent remedial measure was not an issue in this case; case discussing economic feasibility for safer alternative design); *Reese v. Mercury Div. of Brunswick Corp.*, 793 F.2d 1416, 1428 (5th Cir. 1986) (after jury rejected claim of defective design, evidence that manufacturer distributed manual discussing kill switch use in same year as plaintiff's accident was used to demonstrate feasibility with regard to inadequate warning claim, since it was controverted); *Dixon v. Int'l Harvester*, 754 F.2d 573, 583–84 (5th Cir. 1985) (holding subsequent remedial measure rule did not bar evidence of changes made to tractor *by a nondefendant* "shortly after the accident"); *Lolie v. Ohio Brass Co.*, 502 F.2d 741, 744–45 (7th Cir. 1974) (finding trial court did not err in failing to allow subsequent remedial measure where feasibility was not controverted); *Green SeaRiver Mar., Inc.*, No. G-05-423, 2007 WL 173233, at *1 (S.D. Tex. 2007) (order denying motion for new trial because trial court considered subsequent remedial measure where feasibility was controverted); *Seeley v. FKI Logistex*, No. 6:07-CV-381-DNH-DEP, 2009 WL 2871170, at *3 (N.D.N.Y. Sept. 3, 2009, no pet.) (subsequent remedial measure was not an issue; rather case held evidence of change in design less than two weeks after accident was evidence of feasibility of safer alternative design).

15

Moreover, feasibility of precautionary measures is an exception to the subsequent remedial measure rule only if controverted. Here, Hankook did not controvert the feasibility of adding a nylon cap ply. Labuda testified that nylon cap plies were used in the 1980s, that adding a nylon cap ply was feasible, and that it would cost between thirty to fifty cents per tire. The position Hankook took was that the addition would have made no difference in the non speed-rated tire. Because feasibility was not controverted, Hathcock was not entitled to use this exception to the subsequent remedial measure rule.[11]

Alternatively, Hathcock contends the evidence should be admitted under a different analysis. Because FMVSS 139 was a government test that involved speeds of 100 miles per hour, Hathcock argued he should be allowed to present the addition of the nylon cap ply, along with

_____

[11]During cross-examination Grant stated:

> Q. Nylon cap plies were used by the 1980's, correct?
>
> A. Yes. Yeah. In certain tires, yes.
>
> Q. It was certainly feasible for Hankook to have added a nylon cap ply to this tire back in 1997, correct?
>
> A. I don't know. You'd have to ask Hankook that. You can't just throw a nylon cap ply into a tire. There's a lot of design considerations.
>
> Q. So you're saying that you might not be able to just add—you might not—it might not have been feasible for Hankook to add a nylon cap ply to this tire?
>
> A. Yeah. I think that's a question you'd have to ask Hankook, when it was feasible to do it in a certain tire.

From this testimony, it appears Grant did not contest the economic and technological feasibility, but rather, whether the addition would make for good design.

FMVSS 139, to rebut the theory espoused by Hankook's experts that the nylon cap plies were needed only in "high-speed" tires. The trial court granted Hankook's motion in limine "until [Hathcock had] something to impeach." Labuda testified that Hankook's internal testing went above and beyond FMVSS 139 with increased loads and speeds of up to 110 miles per hour, removing possibility of impeachment.[12] Yet, Labuda testified during cross-examination: "Q. Are you aware of any tests that Hankook has done regarding nylon cap plies on that tire? A. On that tire? No, sir, I'm not." Hathcock also claims that he should have been allowed to impeach this testimony. However, after asking this question, Hathcock neither attempted to impeach Labuda, nor raised the issue with the trial court.[13]

Because (1) Hathcock did not demonstrate how Hankook's addition of the nylon cap ply after the accident demonstrated feasibility of adding a ply in 1997; (2) Hankook did not controvert feasibility; and (3) Hathcock did not demonstrate necessity of the evidence of the subsequent remedial measure for impeachment purposes, we conclude that the trial court acted within its discretionary authority by sustaining Hankook's Rule 407 objection.

---

[12]Hathcock cites to testimony by Labuda that nylon reinforcement was used to improve performance of the tire on the indoor wheel machine to comply with "specific indoor high-speed test protocols" such as FMVSS 139. This testimony is consistent with Hankook's position that nylon cap plies were not needed in non speed-rated tires. Labuda further explained that, contrary to Cottles' testimony, "what holds a tire together, we all know, is the rubber and the curing process and the components. So the nylon is not holding the tire together." "Under high speed, centrifugal force does cause the tire to want to expand and the nylon assisted in that. But under normal operations—and we're talking in excess of over hundreds of miles an hour—but in normal operations, that nylon is just passive, noncontributing component to the performance of a tire."

[13]Perhaps that is because Labuda could have understood "that tire" to mean the 1997 detreaded tire, which did not undergo nylon cap testing, as opposed to later models of the Z36.

17

*(3)*     *The Trial Court Was Within Its Discretion in Excluding Evidence Regarding FMVSS 139*

The trial court granted Hankook's motion in limine regarding FMVSS 139, despite arguments that it would be used to demonstrate the inadequacy of FMVSS 119 and to impeach testimony stating the nylon cap ply was needed only in high-speed rated tires.   During the trial, a hearing regarding FMVSS 139 was held at the bench in which counsel clarified that he wanted to introduce only the commentary to FMVSS 139, which stated that the FMVSS 119 standard was inadequate.   Counsel stated, "I think I could ask the witness questions and he could reference the document and perhaps even quote from it without introducing it into evidence and without talking about the new standard."   This intention of not introducing FMVSS 139 was restated later in the trial when counsel declared, "Your Honor, I am happy to never mention FMVSS 139."   "I can talk about internal Hankook tests and never mention FMVSS 139, and I'm happy to do that because I'm not trying to get the regulation into evidence."   The court ruled, "[W]e're not going to get into, 'there's a new standard.'   However, I will allow evidence . . . to show that the 119 was inadequate."   FMVSS 139 was not offered for admission into evidence.   Instead, Cottles testified that NHTSA concluded FMVSS 119 was "ineffective to evaluate steel belted radial tires."

Although he did not seek to introduce FMVSS 139 during trial, Hathcock argues on appeal that the court "erred in excluding evidence relating to FMVSS 139."   If his present complaint concerns admission of the actual rule, it has not been preserved for our review.   *See* TEX. R. APP. P. 33.1.   Moreover, "[e]xistence of current legislation is not relevant for any purpose in

18

considering the duty of a manufacturer to comply with the duty before its enactment." *Robins v. Kroger Co.*, 982 S.W.2d 156, 159 n.2 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (citing *Brown Forman Corp. v. Brune*, 893 S.W.2d 640, 644–45 (Tex. App.—Corpus Christi 1994, writ denied)).  We see no reason that precedent should not also apply to rules or regulations.

It is apparent from the briefing that the goal of introducing FMVSS 139 was to impeach testimony that nylon cap plies are not necessary in low-speed rated tires by demonstrating that the ply was added to Hankook's tire in response to tests in FMVSS 139, which went up to only ninety-nine miles per hour.[14]   Hankook objected to introduction of FMVSS 139 for this purpose based on Rule 403 of the Texas Rules of Evidence, arguing "once the jury hears that there is . . . a subsequent standard, then no matter what we say to try to clear that up, your Honor, the jury is going to be thinking, Well, they should have complied with that later standard."  Because Hankook's experts repeatedly testified that the nylon cap ply was added to satisfy Hankook's own internal testing conducted at speeds above that required by FMVSS 139, the trial court could have found there was little probative value for impeachment purposes.  When weighed with the threat of interjecting a subsequent remedial measure into the trial, the court could have concluded the probative value of the evidence was substantially outweighed by the danger of unfair prejudice and/or confusion of the issues.  TEX. R. EVID. 403.  We find the trial court acted within its discretion in excluding FMVSS 139.

*(4)     The Trial Court Was Within Its Discretion in Excluding Evidence Regarding Firestone*

---

[14]This argument assumes that ninety-nine miles per hour is "low speed" for testing purposes.

*Tires*

Hathcock next complains that the trial court erred in refusing to allow expert Cottles to testify that the scalloping occurring on the belt edge of the tire was a defect also found in recalled Firestone tires. The trial court had previously granted Hankook's motion in limine with respect to mention of Firestone tires. The court required all experts to state that they "had actual dealings as an expert or evaluation of other tires" before any reference to Firestone tires "could come in." Because Cottles did not testify that he had dealings as a Firestone tire expert, the trial court, in its discretion, could sustain Hankook's objection of failure to lay a proper predicate on the basis that Cottles did not "establish the proper foundation," a question of relevancy and admissibility. *See Melton v. Collin County Cent. Appraisal Dist.*, No. 05-03-01737-CV, 2004 WL 3017270, at *2 (Tex. App.—Dallas Dec. 16, 2004, no pet.) (mem. op.).

In any event, Hathcock is unable to establish harm. The following exchanges in front of the jury demonstrate that Cottles testified about scalloping in relation to Firestone tires:

Q.    Are you—have you seen scalloping like this on any other tire?

A.    Yes, I have. The Firestone Wilderness AT tires from the Ford Firestone recall had this same issue . . .

Q.    So this is the same thing that the Firestone tires had?

MR. EZZELL:    Your Honor, I'm going to object to the relevance. I don't think he's established the proper foundation.

THE COURT:    Sustained as to Firestone.

In the excerpt quoted above, Hankook's counsel's objection came too late to address the first above-quoted answer. Although the trial court sustained the objection, there was no request to instruct the jury to disregard the answer to the first question. Thus, Hathcock was able to get before the jury the very evidence it alleges the trial court excluded. Firestone was mentioned again the following day of trial when Cottles stated:

> Why I brought it up was that in the Firestone recall, NHTSA recognized that the belt edges were being pinched due to the pocket design of the pattern so that the rubber wedge was being forced out between the belts, which was leading to belt edge separation failures and tread separations. So that was the reason that I brought up that.

Because Cottles did not establish his qualifications to testify about Firestone tires as required by the trial court, the court was within its discretion to disallow such testimony. Because information regarding Firestone tires was nevertheless presented to the jury, no harm can be shown. We overrule this point of error.

*(5)    The Trial Court Was Within Its Discretion in Admitting Testimony from Hankook's Timely Designated Witnesses*

Hathcock complains that the trial court erred by admitting "testimony from tire expert Charles Patrick and from local store owner Jeff Willingham when neither witness was timely or properly identified as a fact witness." Hankook's trial witness list was filed May 1, 2009, the day designations were due.[15] It designated "Charles Patrick [a]s Defendant's non retained expert." Hankook identified Patrick as "a former tire engineer with Michelin Group, . . . familiar with

---

[15]An amended scheduling order entered after the witness list was produced extended the deadline to designate trial witnesses to August 7, 2009.

21

Hankook's development, design, manufacture, and marketing of its tires." It further designated Willingham as a fact witness, and "Owner of Discount Wheel & Tire in Greenville, Texas, who will testify regarding his education, training, and experience in the Tire Industry . . . [and] . . . knowledge of Hankook tires." The names, addresses, and telephone numbers of these witnesses were provided. We find they were timely designated as witnesses in general.

The trial court's scheduling orders stated, "Defendant Hankook Tire America Corporation must provide to opposing counsel . . . on or before November 3, 2008 the following: (1) the name, address and phone number of their testifying expert(s), (2) a report from each 'retained' testifying expert outlining such expert's opinions, and (3) a curriculum vitae from each 'retained' expert." Patrick was proffered as a "non retained expert." This expert designation did not occur in a manner consistent with the scheduling order. Accordingly, the trial court ruled, "I will allow him to testify as a fact witness but not as an expert, and he will not be allowed to give any opinions since he was not timely designated as an expert."

Hathcock argues that despite the court's ruling, Patrick rendered expert "opinions regarding the quality of Hankook tires, manufacturing processes, quality control procedure and employees." To support this statement, Hathcock cites to volume 13 of the reporter's record, pages "89–[9]4." The record demonstrates that the court sustained all objections by Hathcock raised on the basis that Patrick was giving expert testimony.[16] No error has been shown.

---

[16]Hathcock also argues that Patrick's and Willingham's opinions were generally irrelevant. The trial court overruled relevance objections to Patrick's work history, the fact that he had visited the Daejeon plant, and the fact that Michelin

22

Hathcock also complains that "nearly all of the testimony given by Willingham consisted of expert testimony," citing volume 16, pages 14–29 of the reporter's record. The record demonstrates there were two overruled objections to Willingham's testimony on this basis. The first to the question of whether "Hankook ever told you they weren't going to honor any warranty." The second was to the question "looking at these two tires, from your own personal observation, would you put them on your car?" As a general rule:

> observations which do not require significant expertise to interpret and which are not based on a scientific theory can be admitted as lay opinions if the requirements of Rule 701 are met. This is true even when the witness has experience or training. Additionally, even events not normally encountered by most people in everyday life do not necessarily require the testimony of an expert. The personal experience and knowledge of a lay witness may establish that he or she is capable, without qualification as an expert, of expressing an opinion on a subject outside the realm of common knowledge. *United States v. James Earl Paiva*, 892 F.2d 148, 157 (1st Cir. 1989). It is only when the fact-finder may not fully understand the evidence or be able to determine the fact in issue without the assistance of someone with specialized knowledge that a witness must be qualified as an expert.

*Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *see also Davis v. State*, 313 S.W.3d 317, 349 (Tex. Crim. App. 2010). Willingham's answer to the first question was simply based on his observation of what he had heard from Hankook, and the trial court could have decided any lay person could have answered the second question based on perceptions of sight and touch without the benefit of any specialized knowledge. We cannot say that the trial court acted without

---

still approves and has Hankook manufacture Michelin tires, including Z36-type tires. Although the court did not give its reasons for overruling the objections at the time, similar objections to Willingham's testimony produced the rationale that Hankook's reputation was in issue. For the first time on appeal, Hathcock contends admission of Patrick's and Willingham's testimony was more prejudicial than probative. There was no Rule 403 objection to the testimony during the time of trial. Accordingly, we decline to address this argument.

reference to guiding rules and principles when allowing Willingham to testify based on personal experience.

We find the trial court did not abuse its discretion in allowing Patrick and Willingham to testify. This point of error is overruled.

*(6)*     *No Error Appears Regarding Evidence from the Publication "The Pneumatic Tire"*

During cross-examination of Cottles, Hankook referenced "The Pneumatic Tire,"[17] which Cottles testified was a NHTSA sponsored publication. Direct examination of Grant produced the following exchange:

> Q.     And is that publication, *The Pneumatic Tire*, is that a publication that is approved and sponsored by NHTSA?
>
> A.     Yes.[18]
>
> Q.     And does it appear to be—that is, NHTSA's position—that localized road hazard impacts does, in fact, lead to failure of tires sometime later or can lead to failure of a tire sometime later?

---

[17]The publication was not introduced into evidence.

[18]Hathcock complains that he was unable to object to the representation that "The Pneumatic Tire" was approved by the NHTSA because the version produced by Hankook omitted a disclaimer later added in a 2006 reprint that "The opinions, findings and conclusions expressed in this publication are those of the author(s) and not necessarily those of the Department of Transportation or the National Highway Safety Administration." This complaint was first raised to the trial court in a supplemental motion for new trial, which Hankook argues was untimely pursuant to TEX. R. APP. P. 21.4(b). The judgment was signed October 7, 2009, and the supplemental motion was filed December 1, 2009. A trial court has discretion to consider an untimely supplemental motion for new trial while the court retains plenary power. *Lopez v. Ford Motor Co.*, No. 04-08-00091-CV, 2009 WL 636517, at *2 (Tex. App.—San Antonio March 11, 2009, no pet.) (mem. op.). "[B]ut if the trial court denies a new trial, the belated motion is a nullity and supplies no basis for consideration upon appeal of grounds which were required to be set forth in a timely motion." *Mortiz v. Preiss*, 121 S.W.3d 715, 720 (Tex. 2003). We find that "the untimely motion did not preserve any issue for appellate review." *Id.*; *Lopez*, 2009 WL 636517, at *2.

MR. PEARSON:    Your Honor, I object to the question as calling for speculation as to what NHTSA's position is on any issue.   That's not what the book says.   These are simply a compendium of articles.

THE COURT:    I'll sustain.

Q.    [By. Mr. Ezzell] Okay.   Based on this publication, Mr. Grant, does NHTSA, in fact, support the position that road hazard impact leads to intracarcass pressurization?

MR. PEARSON:    Your Honor, I object to calls for speculation.   He can testify about what's in the book, but he can't testify as to what NHTSA believes or what their opinion is or what they support.

MR. EZZELL:    Your Honor --

THE COURT:    Well --

MR. EZZELL:    -- it's a NHTSA sponsored publication, Your Honor. It's an --

THE COURT:    Overruled.

Even assuming error, Hathcock is unable to demonstrate harm.   After overruling the objection, the court said, "Let me interrupt you, Mr. Ezzell, since we're interrupted anyway," and an immediate lunch break was held.   Grant never answered this question.   Instead, the question was asked in a different form.   After the break, Grant testified that the "publication also support[ed] [his] opinion . . . that road hazard impact leads to intracarcass pressurization and can result in tire failure sometime after the initial road hazard impact."   The issue of speculating about NHTSA's opinion was removed.   Therefore, Hathcock's last point of error is overruled.

25

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

CONCURRING OPINION

One of the disputes was whether nylon cap plies placed on tires made them safer. Some of the testimony was that they were only helpful on tires designed for extremely high speeds. In an attempt to show the nylon cap ply was also safer on non speed-tires, Hathcock proffered evidence that Hankook later added nylon cap plies to the Z36 model tire. The majority opinion states that both parties treated the addition as a subsequent remedial measure and then analyzes the evidence on that basis. The problem is that there was no evidence that the addition was a subsequent remedial measure. Rule 407(a) of the Texas Rules of Evidence, entitled Subsequent Remedial Measures, states, "[w]hen after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent remedial measures is not admissible . . ." Here, there is no evidence of any injury or harm caused by an event that prompted the addition of the nylon cap plies. I believe the majority opinion relies on an inapplicable rule to approve the exclusion of the evidence.

Further, the technology for the nylon cap ply was in existence at the time the tire in question was manufactured. The plaintiffs were required to prove that a safer alternative design was available that was economically and technologically feasible at the time the product was

26

manufactured by application of existing or reasonably achievable scientific knowledge. There is no dispute that the technology was available when the tire was manufactured, and it was later added at a small cost per tire.

No reason has been shown to preclude the relevant evidence that Hankook added the very feature the plaintiffs argued would make a safer alternative design. Exclusion of the evidence was error.

To reverse a judgment based on error in the admission or exclusion of evidence, it must be shown that the error probably caused the rendition of an improper judgment. TEX R. APP. P. 44.1(a)(1). After a review of the entire record and all evidence admitted, I would not find the error was of that magnitude; I concur in the judgment as announced in the majority opinion.

Jack Carter
Justice

Date Submitted: October 6, 2010
Date Decided: December 17, 2010