

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-10-00131-CV

_____

IN THE INTEREST OF E.N.C., J.A.C., S.A.L., N.A.G.,
AND C.G.L., CHILDREN

On Appeal from the 62nd Judicial District Court
Lamar County, Texas
Trial Court No. 78207

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter
Concurring and Dissenting Opinion by Justice Moseley

MEMORANDUM OPINION

As a result of a termination proceeding brought by the Texas Department of Family and Protective Services (Department), the parental rights of mother Edna Lopez to her five children E.N.C., J.A.C., S.A.L., N.A.G., and C.G.L., and Francisco Lopez to his two children S.A.L. and J.A.C., were terminated. Edna and Francisco argue that the evidence was insufficient to establish by clear and convincing evidence that the statutory grounds for termination had been met, or that termination was in the best interests of the children. Edna also complains that the trial court erred in allowing her counselor to testify in favor of the Department over assertions of counselor/patient privilege. We affirm the trial court's judgment.

## I.     FACTUAL AND PROCEDURAL HISTORY

Thirty-one-year-old Edna has a seventh grade education, can barely read or write, and was unable to obtain a GED. She has not worked in six or seven years and has had no income since her disability was cut off in 1999. Since 1999, she worked only once "because I was too slow, not fast enough, and I was too short to lift up the heavy stuff." Edna eats because "me and my mother gets food stamps."[1]

Edna had her first child, E.N.C., at the age of seventeen. Thereafter, she met Francisco, married him, and gave birth to J.A.C. and S.A.L. Edna and Francisco lived together for "eight to nine years" before he was deported to his hometown of San Miguel de Allenda, Mexico. Thereafter, Edna had N.A.G. with another man.

---

[1] Edna's mother, Ruth Miller, is sixty-five years old and receives $674.00 social security income per month.

In 2009, Kimberly Bullard with Child Protective Services (CPS) received a referral that Edna gave "Tylenol PM to her children and [was] taking medications that did not belong to her."[2] At the time of the referral, Edna was pregnant with C.G.L., who was born prematurely on February 10, 2009, and weighed just over three pounds. According to the Department and CPS supervisor Melinda Johnson:

> [W]hen [Edna] went to the hospital to take the baby home, she appeared to be under the influence of drugs which caused her to behave erratically. During an investigation it was found that [Edna] was under the influence of an unknown substance either from prescriptions prescribed for her mother or other unknown sources.

Edna began having migraine headaches four to five years ago. Dr. Donna Womack, who treated Edna while she was on Medicaid, prescribed a barbiturate used to treat migraine headaches called butalbital. Although Edna claims, "I ain't never used 'drugs' drugs," she admitted to abusing butalbital without a prescription. At some point, Edna was no longer eligible for Medicaid, but in January or February 2009, Edna stated she was prescribed twenty butalbital pills at the emergency room and "was abusing it . . . I was taking more than one . . . [a]bout three or four," approximately every day. When her mother received her butalbital pills, Edna would "sneak hers, stole hers without her knowing."

CPS referred the case to Family Based Safety Services (FBSS). Bullard testified, "The initial concerns was, of course, substance abuse. We were also concerned about several people coming in and out of the home that she might not have known. . . . We had concerns about her

---

[2]Allegations were also made against Edna in 2005, 2006, 2007, and 2008; those were dismissed.

3

financial stability and her—her use of prescription medications that did not belong to her." Edna was also on community supervision for possession of marihuana at the time. According to Bullard, Edna reported that three different men could have been C.G.L.'s father, and Edna's "little [knowledge] about men that have lived in the home with her, and us not being able to locate them [wa]s a great concern for these children."

Edna agreed to attend weekly counseling, undergo a psychological evaluation, attend parenting classes, and have her home monitored by case worker Mary Beth Gimbel. She was also to complete a drug assessment through the East Texas Council on Alcohol and Drug Abuse (ETCADA). However, Edna did not begin her FBSS services, and on April 5, 2009, she was arrested for DWI with child passenger S.A.L. On this date, Edna was under the influence of butalbital.

The original petition for protection of the children and suit affecting parent-child relationship was filed by the Department, and on April 6, 2009, the Department was made temporary sole managing conservator. At that point, because there were no family members that were willing to take the children, CPS "had an emergency removal of the children and they went into foster care," with the initial goal of family reunification. Edna was able to visit with the children every Thursday for one hour.

Francisco was deported after an attempt to obtain a green card because he had failed to complete Wisconsin community supervision for an offense involving an underage girlfriend

before he moved to Texas and met Edna. After his deportation, Francisco kept in touch with his children and claimed to provide for their needs. He arranged for his father, Alvaro Lopez, who lived in Texas, to buy the children items they needed. Francisco would then reimburse his father by giving the money owed to his mother, who lived in Mexico. Francisco also mailed clothes to the children. This arrangement continued from the date of his deportation, approximately five years ago. Because Francisco was in Mexico, CPS did not create a service plan for him. However, he participated in child visitation through telephone calls.

In May 2009 CPS prepared a new family service plan for Edna having a goal of family reunification. Pursuant to court order, Edna and Francisco were "to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." Among other requirements in the May service plan, Edna agreed to: (1) participate in counseling with Ronikaye Rusak at Counseling Professionals of Northeast Texas; (2) follow Rusak's recommendations; (3) participate in parenting classes given by Rusak; (4) participate truthfully in a drug assessment with Rusak and follow her recommendations; (5) provide the Department with Health, Social, Education, and Genetic History (HSEGH) forms by May 7, 2009; (6) undergo random drug testing; (7) "keep a calendar of dates for her appointments with counseling, parenting and visitation schedule," and provide "24 hour notice to Kimberly Bullard in the event that she must cancel any appointment"; (8) refrain from taking prescription medication not prescribed to her; (9) not introduce the children to men "she decides to

5

interact socially with . . . [and] not allow men to live with her throughout the life of this case"; and (10) "maintain financial stability and/or employment in order to be able to provide food, clothing, and a safe appropriate home." The May service plan was adopted by the court, and Edna was ordered to comply.

Bullard testified that Edna participated in counseling with Rusak, completed the parenting course, drug assessment, HSEGH forms, and underwent random drug testing. Court Appointed Special Advocate (CASA) Mary Epps testified that Edna attended each and every visitation and that the children were always glad to see her. However, according to Bullard, Edna "missed a lot of services or counseling appointments that she did not notify me of," "never fulfilled the agreed upon ETCADA assessment at the beginning, which was also a condition of probation," failed to keep a calendar of services, had a new boyfriend who admitted he was introduced to the children during visitations, and had not found employment.

On July 9, 2009, Edna was arrested again for DWI by ingestion of hydrocodone which she had obtained from the emergency room for a twisted ankle, and her driver's license was suspended. She served thirty days in jail and was released on August 7, 2009. Although her license was suspended, Bullard and Epps testified they witnessed Edna drive herself to visitation several times. In October 2009, Edna was recommended to an outpatient program at Sabine Valley which she completed in January 2010. Epps testified that before Christmas 2009, Edna attended visitation wearing her sunglasses. Mary claimed Edna "actually stumbled over a couple

6

of chairs trying to get to the table. And she was really screaming and hollering at [Francisco's father Alvaro]."

Despite Edna's mishaps with regard to the service plan, the Department decided to recommend a monitored return of the children during a February 2010 hearing in front of the trial court. However, Bullard testified that when she arrived for the hearing, Edna was slurring her speech and was "stumbling a little bit, walking across the room." When questioned, Edna initially denied any drug use, and when pressed, admitted to ingesting "NyQuil, Stacker 3, which is a diet supplement that you get over the counter, and an off-brand of Benadryl." Becoming informed of Edna's condition, the trial court ordered her to immediately take a drug test before the children were returned to her. Edna failed the test; the result was positive for barbiturates, and she admitted that she did not have a prescription for the drug.

After the failed drug test, Bullard testified Edna did not attend weekly counseling, did not complete the conditions of her DWI community supervision, did not maintain stable housing with working utilities, did not seek employment, and did not go to the literacy program. One time during visitation, Bullard "stopped her and talked with her some more about her case things, and she—she became—she was shaking, her eyes were—were glassy, her speech became slurred. And even walking her out of the building, her motions became a little bit slower than normal." A motion to revoke her DWI community supervision, containing allegations that Edna failed to complete her DWI education program, failed to report in person, used drugs, and was behind on

7

her fees was filed in March 2010.

After one six-month extension, the trial court determined that the date of dismissal for the cause would be on October 9, 2010. A few days before the dismissal date, the trial court heard evidence from Edna, her boyfriend, Jim Hale, Francisco, Lopez, Rusak, Bullard, Epps, Johnson, and C.G.L.'s foster parent. After hearing recommendations regarding termination from several parties, the trial court found that the Department met its burden of proof to demonstrate a statutory ground justifying termination of parental rights and also found that termination of both parents' rights was in the children's best interests.

## II. STATUTORY GROUNDS FOR EDNA'S TERMINATION WERE MET BY CLEAR AND CONVINCING EVIDENCE

Among other statutory grounds under Section 161.001(1) of the Texas Family Code, Edna's parental rights were terminated on grounds (E) and (O).[3] TEX. FAM. CODE ANN. § 161.001(1)(E), (O) (West Supp. 2010). Specifically, the trial court found that she:

> engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children; . . . . [and]

> failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children;

---

[3]The trial court's order of termination also listed Section 161.001(1)(D), (F), and (P) as grounds for termination. The Department focuses on Section 161.001(E) and (O), and because we find the evidence sufficient to prove these grounds of termination, we need not discuss the remaining statutory grounds included in the court's order.

*Id.*

Edna argues that the Department failed to prove these grounds by clear and convincing evidence.

## A. Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Decisions from Texas courts show great respect for the biological bond between parent and child, recognizing "that the natural right which exists between parents and their children is one of constitutional dimensions." *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied). However, the Texas Supreme Court has also recognized that "the rights of natural parents are not absolute; protection of the child is paramount . . . . The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (citing *J.W.T.*, 872 S.W.2d at 195). The child's emotional and physical interests must not be sacrificed merely to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

We strictly scrutinize termination proceedings in favor of the parent. *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (citing *Holick v. Smith*, 685 S.W.2d

18, 20 (Tex. 1985).

To terminate an individual's parental rights to his or her child, the Department must prove, and the trial court must find, by clear and convincing evidence, both of the following statutory requirements:  (1) that the parent has engaged in one of the statutory grounds for termination; and (2) that termination is in the child's best interest.  TEX. FAM. CODE ANN. § 161.001 (West Supp. 2010); *C.H.*, 89 S.W.3d at 23.  The clear and convincing burden of proof has been defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN. § 101.007 (West 2008); *C.H.*, 89 S.W.3d at 23.  Due process demands this heightened standard. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).  Thus, in reviewing termination findings, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations.  *C.H.*, 89 S.W.3d at 25.

In a legal sufficiency review, termination findings are given appropriate deference.  *See J.F.C.*, 96 S.W.3d at 266; *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 679 (Tex. App.—Austin 2005, no pet.).  In such cases, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder could reasonably have formed a firm belief or conviction that the grounds for termination were proven.  *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 266.  We assume that the fact-finder resolved disputed facts in favor of the finding if a reasonable fact-finder could do so and disregard evidence that the

10

fact-finder may have reasonably disbelieved or whose credibility may reasonably be doubted. *J.P.B.*, 180 S.W.3d at 573. We consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573–74.

The inquiry in a factual sufficiency review is "whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations." *C.H.*, 89 S.W.3d at 28. We consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in weighing the disputed evidence, the fact-finder could have reasonably resolved the conflicts to form a firm conviction that the State's allegations concerning the grounds for termination were true, then the evidence is factually sufficient and the termination findings must be upheld. *Id*. at 18–19; *see also J.F.C.*, 96 S.W.3d at 266. In applying this standard in light of the "clear and convincing" language required by Section 161.001, we must be careful not to "be so rigorous that the only fact-findings that could withstand review are those established beyond a reasonable doubt." *In re R.A.L.*, 291 S.W.3d 438, 443 (Tex. App.—Texarkana 2009, no pet.) (quoting *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006)).

11

Only one predicate finding under Section 161.001(1) of the Texas Family Code is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *A.V.*, 113 S.W.3d at 362; *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). "If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights." *K.W.*, 335 S.W.3d at 769.

### B. The Evidence Was Sufficient to Meet Ground (E)

Ground (E) alleged that Edna engaged in conduct which endangered the physical or emotional well-being of the children. Endanger "means to expose to loss or injury." *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). This statutory ground for termination "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *Id.* at 366–67 (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). "The conduct to be examined includes what the parent did both before and after the child was born." *Id.* "To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct." *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex.

12

App.—Dallas 1995, no writ); *N.S.G.*, 235 S.W.3d at 367). Termination for indirectly endangering a child under this ground "must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *Perez*, 148 S.W.3d at 436 (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.)); *see Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367. "The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct." *Perez*, 148 S.W.3d at 436 (citing *N.K.*, 99 S.W.3d 295, 300 (Tex. App.—Texarkana 2003, no pet.)).

"Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct" by a parent sufficient to support a petition to terminate parental rights. *Perez*, 148 S.W.3d at 436. "A parent's failure to remain drug-free while under the Department's supervision will support a finding of endangering conduct under subsection (E) even if there is no direct evidence that the parent's drug use actually injured the child." *In re J.A.W.*, No. 02-08-215-CV, 2009 WL 579287, at *4 (Tex. App.—Fort Worth Mar. 5, 2009, no pet.) (mem. op.) (citing *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)).

The Department argues that Edna's abuse of butalbital, incarceration, and history of irresponsible choices endangered the children's physical or emotional well-being. Edna responds that she "was a poor person who controlled her back pain with pain pills because she could not get

any medical attention." Aiding the trial court's determination in resolving this matter is the history of alleged addiction outlined below.

Edna had no income and previously qualified for Medicaid. She was legitimately prescribed butalbital by her physician four to five years ago for migraine headaches. When her Medicaid ran out, Edna had no insurance. Over her lifetime, Edna visited the emergency room over ninety-nine times. Edna admitted that after her prescription butalbital ran out, she would take her mother's without consent. After C.G.L.'s birth in February 2009, Edna was prescribed hydrocodone. Edna testified,

> When I finished with that, a month—almost a month after the baby was born, I still have problem in my back. They thought the baby was on my nerves, but it never went away so I had—I made an appointment with Dr. Nelson. He done a MRI, which from the beginning he gave me some pain pills because I was hurting real bad in my right side. . . . And he done an MRI on me and it came back I had a spot about like this big down in here.

She was given hydrocodone "10s" every month.

In April 2009, when she was first arrested for DWI with a child passenger,[4] Edna claimed that she had been drugged by a man named Tim Austin who lived with her in her mother's home. She explained

> Sunday, [Austin] had got a woman called up CVS, pretend they me and got my mom's medication filled and he went up there and picked it up. . . . That night before I left to go to the store—me and my daughter. We was heading to the store to get gas and get the formula for the baby. My doctor prescription was in the house. I found out that he had put eight pills in my Dr. Pepper bottle, like two hours before I left . . . he sat there and bragged about it. He said it . . . I drank the

---

[4]Edna understood that she was putting S.A.L. in danger when she drove under the influence of a prescription drug.

14

Dr. Pepper way before I left. When it kicked in so quick—he put seven, eight pills. It kicked in real quick. . . I was fine when I pulled out of my driveway, but once I got to the stop sign, turned, and the cop pulled me over after when I started getting—walking toward the back—that's when I started getting dizzy.

Edna's monthly hydrocodone prescription continued until her Medicaid was cut off in June 2009. That same month, she visited the emergency room for sinus pressure and was given a one-month supply of Darvocet for "the pain in my ears."

In July 2009, when Edna was pulled over the second time for DWI, Edna was taking hydrocodone, for which she had been given a prescription by the emergency room physician for a twisted ankle. When she showed up under the influence in February 2010, Edna claimed that she did not knowingly ingest a barbiturate. She explained that she had a headache and took NyQuil and asked her cousin for "aspirin or Tylenol." Later, due to her cough, she took "two little white pills I got from my cousin."

Recognizing that she suffered from an addiction, Edna testified, "In the past, yes, I did have a drug problem. But I got myself straightened up." She also stated, "I'm the one that took the pills. And I regret it. And I'm going to always be an addict. And I'm going to rehab to get help." At the time of the trial in October 2010, Edna was in an inpatient drug treatment program. Edna claimed that she had not used drugs since February 2010. A March 2010 and July 2010 random hair and urine drug test were both negative. Yet, her psychologist, Rusak, claimed that when Edna arrived for her March 3, 2010, appointment forty-five minutes late, her hands were shaky and her eyes were glassy, and Rusak testified that when Edna appeared, "I noted in here that

15

her hands were shaky." Rusak stated that there were no issues with Edna's balance or speech during this meeting.

Also, "imprisonment is certainly a factor to be considered by the trial court on the issue of endangerment." *N.S.G.*, 235 S.W.3d at 367. The trial court noted that Edna was subject to a pending motion to revoke community supervision. The motion included allegations that Edna did not pay fees as ordered; failed to report in July 2009, November 2009, and February 2010; did not complete her DWI education program; and used drugs—an allegation developed in light of the court's February 2010 drug test. Also, according to Bullard and Epps, Edna continued to drive to parent-child visits on a suspended license, despite warnings from Bullard that she could be arrested for such conduct.

There is evidence that Edna was ingesting some form of pain medication until at least February 2010; the trial court was authorized to disbelieve that this was not her voluntary act. Edna had been arrested for DWI twice and had tested positive for barbiturates on the day her children were going to be returned to her. Edna admitted that she will always be an addict. In March 2010, her counselor testified that Edna appeared to be under the influence. Although she was accepted to an inpatient drug treatment program which she was attending at the time of trial, she had not completed the program. Also, due to her positive drug test, failure to report, and alleged noncompletion of DWI courses, the trial court could consider the possibility that Edna could be subjected to a second round of incarceration likely. Viewing the evidence above in the

16

light most favorable to the finding of termination, the court could find that Edna's drug addiction, combined with actions which subjected her to the possibility of further incarceration, was a course of conduct that endangered the children. We find the trial court's termination on ground (E) was supported by legally sufficient evidence.

Looking at the evidence in a neutral light, we further conclude the evidence was factually sufficient to support termination under this ground. "[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct." *N.S.G.*, 235 S.W.3d at 367–68. Although an excuse was provided for the first DWI, in which there was a child passenger subject to physical danger, there was no excuse for the second DWI. Edna stated she was taking hydrocone for a twisted ankle at the time. The trial court could have found that Edna knew the risk of driving under the influence and disregarded it. Also, Edna engaged in conduct which could have subjected her to further incarceration. The court could decide that Edna's activities resulted in uncertainty and instability in the life of her children. Therefore, we find that the evidence could reasonably form a firm belief that Edna's conduct endangered her children by clear and convincing evidence.[5]

### C.     The Evidence Was Sufficient to Meet Ground (O)

The trial court also found that Edna failed to comply with her court-mandated service plan

---

[5]Moreover, the specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct.   *N.K.*, 99 S.W.3d at 300.

17

and that such failure was a statutory ground supporting termination. The Department conceded that Edna completed parenting classes, the drug assessment, the HSEGH form, psychological evaluation, and random drug testing, and demonstrated her parenting skills, but complained that Edna failed to participate in counseling and follow Rusak's recommendations, did not completely keep a calendar of dates for her appointments, took prescription medication not prescribed to her, introduced the children to her "so-called boyfriend" of four months, and failed to maintain financial stability and/or employment in order to be able to provide food, clothing, and a safe, appropriate home.

We first address Edna's failure to maintain financial stability and/or employment in order to be able to provide food, clothing, and a safe, appropriate home.[6] Edna testified, "I'm going to fight for my disability and still put application for job. I'm still doing that, which I hadn't had no luck." She stated that her last application for a job was six months ago at the Budget Inn. In the previous year, she had tried motels and fast food places, but never obtained employment. She stated that she had been trying to find a job since 1999, which prompted this discussion:

> Q.     Been trying to find a job since 1999?
>
> A.     Yeah. I mean, I put application so often. You go for a while, I wait a while, go do it again. Wait a while, do it again. You don't want to do it every week same place. So, you know, I wait, you know, get a space between each

---

[6]Edna was never accused of failing to maintain an appropriate and clean home for the children. Bullard testified she had "maintained the home throughout most of the case. However, she's had, you know, some utilities cut off. She's had to move. There's still—there's still great concern for that." At the time of trial, Edna was living with her aunt in a trailer home, but hoped to move to a three-bedroom, two-story home with her mother. Gas and water were turned on in the home, but electricity was not.

18

other, then go try again.

> Q. So this is October 4, of 2010. How many job applications have you honestly filled out this year?

> A. This year, not that many.

> Q. Two?

> A. I think it was about three. Three or four.

> Q. Do you think that's making an effort to find a job?

> A. It's kind of hard to get out there, get around. Through first of year, being wintertime, it's hard for me to walk around. I have a spot in my back I cannot walk too far or stand up too long.

CASA worker Mary Epps was concerned when Edna told her she was not looking for a job and she was not planning on having a job.

Given the evidence of Edna's lack of income, work history, attitude toward finding employment, and the fact that she would be relying on other sources of income to pay a month-to-month lease on the home she intended to occupy, the court could have found by clear and convincing evidence that Edna failed to comply with its order requiring her to maintain financial stability and/or employment in order to be able to provide for herself and her children.

Next, Edna was required to attend counseling on a weekly basis. Edna acknowledged that she missed several appointments, some due to "transportation issues" and others due to

19

incarceration. Rusak testified, "[O]ver the course of a year and a half, she had twenty-three[7] appointments and 11 no shows. So there was some consistency there for a—for some time when I thought she was making progress." Rusak's opinion regarding Edna's overall progress changed when, according to Rusak, Edna "came to the office drug induced" and wearing sunglasses. Rusak noted "[h]er eyes are glassy, pupils are small." Rusak believed Edna required inpatient treatment. Edna was not accepted for inpatient treatment because she denied recent drug abuse. Rusak "talked to her and . . . said: Here's what you have to do. You wouldn't had to have used a substance within so long. I think you're being dishonest with your drug use, so here's the facts. You know, go to the drug screening and do what you need to do to get into drug rehab." Edna was accepted into an inpatient program on July 28, 2010. In Rusak's opinion, Edna was "not very adamant about helping herself" and "the bare minimum." Edna acknowledged that she was supposed to attend weekly counseling, and when asked why she missed six sessions between April 20 and June 16, 2010—a time when she was not incarcerated—she simply answered, "I don't remember back then."[8] Based on this evidence, the trial court could have found that Edna did not follow Rusak's recommendations to attend weekly counseling.

Next, Bullard testified that Edna did "[n]ot completely" comply with the requirement to

---

[7]In total, Edna had twenty-six appointments. Three appointments were kept with another counselor because Rusak was on maternity leave.

[8]Edna points out that on February 10, 2010, the court found that she had demonstrated appropriate compliance with the service plan, and on March 1, 2010, the Department provided a permanency plan which stated Edna was continuing to attend counseling. Edna argues that the Department judicially admitted compliance with the requirement that she attend counseling. However, the Department's statement that Edna "resumed her . . . counseling . . . with counselor Ronikaye Rusak" does not judicially establish that Edna participated in counseling and followed Rusak's recommendations.

20

keep a calendar of appointments and notify her if she was unable to attend the appointments. "I am not sure that she kept a calendar of her appointments on her." Edna also took barbiturates on February 10, 2010, which, by her own admission, she obtained from a relative. Thus, she (allegedly unknowingly) ingested prescription medication not prescribed to her.

Edna also introduced the children to Jim Hale, who was described by Edna as her "so-called boyfriend" of four months. At the time of trial, Hale was repairing a three-bedroom, two-story home for a landlord in exchange for reduced month-to-month rent of $250.00. Edna planned to live with the children in the home if they were returned to her. Both Edna and Hale were listed on the lease. Hale testified he planned to begin living with Edna. With respect to the relationship, however, Edna stated, "We're not rushing in. We're taking it slow." Although Edna was to refrain from "introducing [the children] to those individuals that she decides to interact socially with," Hale testified that he had been to every parent-child visitation for the last four months and that the children know him.

We find the evidence legally and factually sufficient for the trial court to form a firm belief or conviction that Edna violated its orders under the statutory (O) ground of termination.

III.     STATUTORY GROUND FOR FRANCISCO'S TERMINATION WAS MET BY CLEAR AND CONVINCING EVIDENCE

Among other grounds, Francisco's parental rights were terminated upon the finding that he engaged in conduct which endangered the physical or emotional well-being of J.A.C. and S.A.L.[9]

---

[9]The trial court also found that grounds (D), (F), and (N) of Section 161.001(1) were met.

We review whether legally and factually sufficient evidence supported this finding. In termination cases, "[w]hen there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts." *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005)). In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party. *Id.*

Prior to the birth of the children, Francisco was placed on probation in Wisconsin because he committed an offense involving an underage girlfriend.[10] Instead of completing his probation, Francisco moved to Texas and married Edna. In 2004 or 2005, when he went to Dallas to inquire about obtaining a green card, it was discovered that he had absconded supervision, which resulted in his arrest and ultimate deportation to Mexico. Although he wanted to return to the United States, Francisco said he could not return for ten years. He claimed that Edna was a good mother when they were together and was surprised to discover her conduct.

Again, endangering acts need not have been directed at the children, or have caused an actual injury or threat of injury to the children to constitute conduct that endangers their physical or emotional well-being. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Conduct which occurred in the past which exposed J.A.C. or S.A.L. to loss or injury can be considered. *N.S.G.*, 235 S.W.3d at 367. However, termination for conduct indirectly affecting the child "must be based on

---

[10]Beyond this description, the actual offense is unknown. The date of his Wisconsin conviction was not introduced in evidence.

more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *Perez*, 148 S.W.3d at 436; *N.S.G.*, 235 S.W.3d at 367. "The conduct to be examined includes what the parent did both before and after the child was born." *N.S.G.*, 235 S.W.3d at 366–67; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see In re D.M.*, 58 S.W.3d 801, 808 (Tex. App.—Fort Worth 2001, no pet.) ("It is inconsequential that the parental conduct considered in a termination proceeding occurred before the child's birth.").

Francisco was placed on probation for having an inappropriate relationship[11] with an underage child who he referred to as his girlfriend. The trial court was free to determine that the "inappropriate relationship" involving a minor implied more than a single act or omission. This inappropriate relationship led to the imposition of Wisconsin probation, and Francisco's conduct in absconding the jurisdiction and violating the terms of his probation by moving to Texas established a voluntary course of conduct. "[I]ntentional criminal activity which expos[es] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well being of the child." *Clawson v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-05-00116-CV, 2006 WL 2032270, at *4 (Tex. App.—Austin July 21, 2006, no pet.) (mem. op.) (quoting *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.)); *Allred v. Harris County Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. App.—Houston

---

[11]Evidence as to how a parent has treated another child in the past is relevant regarding whether a course of conduct under subsection (E) has been established. *See Jordan*, 325 S.W.3d at 724 (citing *In re D.T.*, 34 S.W.3d 625, 636–37 (Tex. App.—Fort Worth 2000, pet. denied)).

[1st Dist.] 1980, writ ref'd n.r.e.).[12]   Because Francisco's conduct led to his deportation, it led to the physical loss of the children's father figure.   While deportation alone cannot establish a course of conduct endangering a child, it is a fact properly considered when assessing endangerment. *See Boyd*, 727 S.W.2d at 533–34; *D.M.*, 58 S.W.3d at 808 ("The State need not show incarceration was a result of a course of conduct endangering the child; it need only show incarceration was part of a course of conduct endangering the child.").   Therefore, the trial court could conclude that the consequences of Francisco's criminal acts in the past subjected J.A.C. and S.A.L. to a life of uncertainty and instability, endangering their physical and emotional well-being.   *N.S.G.*, 235 at 367–68.

In reviewing the evidence under a light most favorable to the ruling, and with appropriate deference to the finder of fact, we conclude the evidence legally sufficient to support termination under ground (E).   The trial court could have formed a firm belief or conviction that this ground for termination was proven.

Also, there are no undisputed facts in this analysis; there is only the argument that Francisco's actions constituted a single act instead of a course of conduct.   We will sustain a factual insufficiency point only if the evidence was so weak or the evidence to the contrary was so overwhelming that the fact-finder could not have reasonably concluded there was a high

---

[12]Deportation, like incarceration, is a consequence of an action.   Thus, just as incarceration alone is not enough to demonstrate a course of conduct that endangers the physical and emotional well-being of the children, deportation alone is also not enough.   *See Adoption of Andreas*, No. 10-P-817, 2011 WL 93040, at *3 n.4 (Mass. App. Ct., Jan. 11, 2011); *In re M.R.G.*, No. 20080250-CA, 2008 WL 2224277 (Utah App. May 30, 2008).

probability that Francisco engaged in a course of conduct which endangered the children. *D.M.*, 58 S.W.3d at 808. We cannot reach such a conclusion with respect to this case. Therefore, we find the evidence was factually sufficient for the trial court to have found that the Department's burden to prove a course of conduct which endangered the children by clear and convincing evidence was met.[13]  *C.H.*, 89 S.W.3d at 28.

## IV.  SUFFICIENT EVIDENCE ESTABLISHED TERMINATION WAS IN THE BEST INTERESTS OF THE CHILDREN

### A.  The *Holley* Factors

There is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome the presumption. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In deciding whether termination would be in the best interest of the child, the trial court may consider this nonexclusive list of factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the

---

[13]Francisco also argues that his counsel rendered ineffective assistance by failing to include a complaint about the legal and factual sufficiency to support the ground of termination that Francisco constructively abandoned his children. Section 263.405 of the Texas Family Code requires a party appealing an order terminating a parent-child relationship in a state-initiated termination proceeding to file a statement of points on which the party intends to appeal "[n]ot later than the 15th day after the date a final order is signed." TEX. FAM. CODE ANN. § 263.405(b)(2) (West 2008). Although counsel for Francisco filed a statement of points, the constructive abandonment ground was not challenged. Typically, we may not address an issue that is not included in a timely filed statement of points. TEX. FAM. CODE ANN. § 263.405(i) (West 2008); *In re J.H.G.*, 302 S.W.3d 304, 306 (Tex. 2010). However, an appellant may make a due process claim and raise ineffective assistance of counsel on appeal when there is a complete failure to file the statement of points, which precludes the reviewing court from considering a meritorious complaint. *See In re J.O.A.*, 283 S.W.3d 336 (Tex. 2009); *see also In re B.G.*, 317 S.W.3d 250, 256 (Tex. 2010). We need not consider this point of error because we find the evidence was sufficient to demonstrate Francisco engaged in conduct which endangered the children's physical or emotional well-being.

parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *K.W.*, 335 S.W.3d at 770. Also, evidence offered to prove grounds for termination, contact between the natural parent and child, degree of financial support, quality of care rendered by a child's care giver, and their willingness to adopt are all relevant to determining if the termination is in the best interest of the child. *C.H.*, 89 S.W.3d at 28; *In re J.W.M.*, 153 S.W.3d 541, 548–49 (Tex. App.—Amarillo 2004, pet. denied) ("While the prospect of adoption into a stable home cannot alone be said to be a determinative factor, it clearly is among the factors the court properly could consider."). It is unnecessary to prove all of these factors as a condition precedent to parental termination. *C.H.*, 89 S.W.3d at 27.

B. **Termination of Edna's Parent-Child Relationship Was in the Children's Best Interests**

In this case, Epps testified that E.N.C., the oldest child, did not want to return home to her mother in the condition Edna was in. Epps stated that the other children old enough to speak wanted to be reunited with Edna. The children's ad litem attorney, Larry Maninger, testified that the children, except for the seven-year-old, wanted to be returned to Edna. However, he also testified, "They've also made it very clear that they don't want to go back to their mother unless

26

their mother gets her problems resolved." Francisco's father testified the children desired to live with their mother. We find this factor weighs against termination.

The oldest child in this case was fourteen at the time of trial, and the youngest child was less than two years old. The emotional and physical needs of the children now and in the future are great. This factor weighs in favor of termination.

With respect to emotional and physical danger to the children, while the Department did not prove the allegation that Edna gave the children medications that were not age-appropriate, Edna drove while under the influence with S.A.L. in the car and appeared in court under the influence on the day of the monitored return of the children. The court could have found that Edna's drug addiction, and possible future incarceration, presented emotional and physical danger to the children now and in the future. This factor weighs in favor of termination.

Edna's parental abilities, aside from her addiction to drugs and driving while under the influence, were good. Bullard testified that Edna always kept a clean and appropriate home for the children and that the children were always happy to see Edna at parent-child visitations, at which Edna acted appropriately. Edna saw that the children attended school and, although J.A.C. had trouble with math, all of the children had passing grades. This factor weighs against termination.

Edna planned to move into a three-story, two-bedroom house with the children if they were returned to her, pending her completion of inpatient treatment and the awaited outcome on the

revocation of her community supervision. Bullard testified the Department's plan was to have the four older children remain together in foster care with the Department named sole permanent conservator of the children. The Department planned for C.G.L. to remain with, and possibly be adopted by, her separate foster family. Whereas Edna had lived in five residences in the past eighteen months, Bullard described that the children were in a stable environment in their foster home placement. As to C.G.L., foster parent Amber Mitchell testified that C.G.L. was placed in her home when she was seven months old and has settled into her new family of seven. C.G.L. calls Mitchell mama, Mitchell and her husband have the ability to support C.G.L., and Mitchell testified they would adopt C.G.L. immediately if possible. Mitchell testified, "I think the best interests would—you know, for her, for stability, for rights to be terminated and if we were allowed to adopt so she can continue in the life she's known." We find the plans for the children and stability of the home or proposed placement factor neutral, with the exception that as to C.G.L., the foster parents' plan weighs in favor of termination.

The acts indicating that placement with Edna might not be a proper placement included her problems with prescription drugs, her lack of income, and inability to properly search for and obtain employment. This evidence could lead a fact-finder to believe that the children's needs would not be taken care of. Bullard also testified that Edna's conduct in allowing men to live with her whom she did not know well also endangered the children. This factor weighs in favor of termination.

28

We now consider Edna's excuses. Edna argues that as of February 2010, she has remained drug free and thus, termination is not in the best interests of the children. As stated in *Jordan*:

> Although evidence shows Jordan has made some recent improvements to her past situation, those improvements cannot absolve her of her long history of irresponsible choices. *See In re J.O.A.*, 283 S.W.3d at 346 ("While the recent improvements made by [appellant] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices.").

325 S.W.3d at 732. Edna also argues that her lack of education and misfortune with respect to medical problems should not be considered. "A parent's lack of education, training, or misfortune is considered when reviewing excuses for acts or omissions of a parent; however, these considerations do not negate evidence tending to show that termination is in the child's best interest." *Id.* (citing *In re S.H.A.*, 728 S.W.2d 73, 89–90 (Tex. App.—Dallas 1987, writ ref'd n.r.e.)).

With regard to all of the children, Bullard testified, "[T]heir placement should continue as they are," and "termination of parental rights should be granted at this time" because "these children are in a stable environment in which they're thriving in and they're growing. To put them back into a home in which nothing's changed would create an environment in which they could possibly digress from where they are now." Maninger testified that he could not recommend that the children be returned to Edna in her current state. However, with the exception of C.G.L., Maninger recommended that Edna's rights not be terminated. Epps also

29

recommended termination.

Considering the *Holley* factors, and in light of all of the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Edna's parental rights was in the best interests of the children. Therefore, we conclude the evidence was legally and factually sufficient to support the court's best-interest finding. This point of error is overruled.

**C.**      **Termination of Francisco's Parent-Child Relationship Was in the Children's Best Interests**

There was no evidence that any of the children wanted to live with their father in Mexico. J.A.C. was twelve at the time of trial, and S.A.L. was eleven. The emotional and physical needs of the children now and in the future are great. The first two *Holley* factors weigh in favor of termination.

As far as the emotional and physical dangers to J.A.C. and S.A.L. now and in the future, Edna testified Francisco never endangered the children and was a good father. She said Francisco raised E.N.C. and N.A.G., even though they were not his children. Edna stated that Francisco provided for his children's physical needs. "[H]e does the best he can through his daddy or whatever he can. He does what he can for his children" and provides "whatever I need. If I need, say-- . . . when school first starts, my children need shoes, backpacks, couple suit of clothes. Their grandpa will—actually it's their dad doing it, but either grandpa go to get it for them, and the dad reverses back to their mom in Mexico because it's easier that way." From Edna's account, Francisco was a good parent. No evidence was presented regarding his parental ability. Also,

30

there was no testimony that the Department had programs available which could assist Francisco in Mexico to promote the best interests of the children. We find the third through fifth *Holley* factors weighs against termination.

Although Francisco testified, it appeared that he did not have a plan for J.A.C. and S.A.L. He stated that the children should be with their mother. The agency planned for the four oldest children to remain together in foster care while C.G.L. stayed with her foster family. We find this sixth factor weighs in favor of termination. However, with respect to the stability of Francisco's home or proposed placement of J.A.C. and S.A.L., no testimony was presented. Thus, the seventh *Holley* factor is neutral.

Francisco's inappropriate relationship with a minor and resulting deportation for failure to complete his probation indicated that the parent-child relationship might not have been appropriate. No excuse for these acts was provided. We find the last two *Holley* factors weigh in favor of termination.

Bullard stated that because Francisco has not provided any financial support and had not contacted the children, with the exception of a few telephone calls, termination was recommended. Epps and Johnson also recommended termination. Even Francisco's father testified that it would be good for a married couple to adopt J.A.C. and S.A.L. and feed and clothe them and provide them with a good education.

Considering the *Holley* factors, and in light of all of the evidence, the trial court could have

reasonably formed a firm belief or conviction that termination of Francisco's parental rights was in the best interests of J.A.C. and S.A.L. Therefore, we conclude the evidence was legally and factually sufficient to support the court's best interest finding. This point of error is overruled.

## V.       TRIAL COURT DID NOT ERR IN ADMITTING RUSAK'S TESTIMONY

In a separate point of error, Edna argued that the trial court erred in admitting Rusak's testimony over Rule 501 objections of privilege. TEX. R. EVID. 501. The admission or exclusion of evidence is a matter within the sound discretion of the trial court. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *Hathcock v. Hankook*, 330 S.W.3d 733, 740 (Tex. App.—Texarkana 2010, no pet.). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *Hathcock*, 330 S.W.3d at 740. We must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

As Rusak was about to testify, Edna objected that she was "not allowed to—to testify as concerning any confidential communication without" her permission. The Department argued that Edna signed a waiver of privilege indicating her consent for Rusak to consult Bullard. Edna also had signed a family service plan stating, "I understand information for the evaluation of my progress may come from any and all of the following sources: Me, family members, Child Protective Service staff . . . and other agencies, individuals, and community professionals."

32

Counsel for Edna complained that her waiver authorizing communications from Rusak to Bullard was "specific to Ms. Bullard."[14]  The trial court found that because Edna allowed Bullard to be privy to counseling sessions, she waived any privilege.

Edna argues that the waiver was not produced in evidence.  However, the record of the proceedings indicate that the waiver was provided to counsel and "[t]hat's what I just handed to you."  Rusak also testified, "[S]he did give me release to give information to her case worker also in the intake."  In light of the record, and possibility from the record that the waiver was available in the courtroom, we find that the trial court did not err in finding a waiver of privilege.  Edna's last point of error is overruled.[15]

## VI.    CONCLUSION

We affirm the trial court's judgment.


Jack Carter
Justice


CONCURRING AND DISSENTING OPINION

Edna Lopez and her children who were the subject of this suit first came to the attention of the judicial system April 6, 2009, when an original petition was filed by the Child Protective

---

[14]On appeal, this argument that the waiver was specific to Bullard was not advanced.   Therefore, we do not address it.

[15]We further note that Edna would be unable to demonstrate harm in light of cumulative testimony offered by Bullard that Edna did not pass the February drug test, did not attend weekly counseling, was arrested for DWI during the pendency of the case, drove with a suspended license, and appeared under the influence at a parent-child visitation.

Services division of the Texas Department of Family and Protective Services (CPS). At that time, Francisco Lopez[16] was generically identified (with two others) as "the father of the child," with the observation that his address was not known. An amended petition filed two days later alleged Francisco to be the father of the male child born March 25, 1996, and the female child born November 19, 1999; again, it was alleged that Francisco's whereabouts were unknown. An attorney ad litem was appointed for Francisco and the alleged father of another of the children; that attorney ad litem duly filed a response on Francisco's behalf. A family service plan, which made no mention of Francisco, was filed May 29 and identified the goal of the plan to be family reunification. Francisco was served by certified mail July 27, 2009. In a "Permanency Plan and Permanency Progress Report" filed by CPS December 15, 2009, Francisco is mentioned as the father of the two children mentioned previously with the notation that he cannot return to the United States for ten years due to unnamed criminal activity while in this country, but would continue to participate in monthly conference calls with the children. Each subsequent progress report repeats the same information about Francisco verbatim. There is no indication that any home study of Francisco's home was conducted or that he was permitted to participate in any plan dictated by the trial court or CPS at any time, except for the monthly telephone calls previously noted.

Once CPS has been appointed managing conservator of a child, Texas Family Code

---

[16]To distinguish Francisco Lopez from Edna Lopez, the mother of all of the children, reference to these people will henceforth be made by their first names only.

Section 263.401 contains very precise and explicit time limits on the judicial involvement with the child. Specifically, it prescribes that "on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit" with the proviso that one 180-day extension of that one-year period can be made if the "court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." TEX. FAM. CODE ANN. § 263.401 (West 2008).

Here, the first order appointing CPS as temporary managing conservator of the children was entered April 9, 2009. The entry of this order thus would have dictated the first deadline of the first Monday after April 9, 2010, for final determination, absent an extension. Even with the 180-day extension that was granted, CPS and the trial court were forced to take the fork in the road of either terminating the parental rights or dismissing the case very shortly after the date set for hearing. Everyone was operating under the statutory gun.

The trial court terminated Francisco's parental rights, finding that he had: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children; (3) failed to support the children in accordance with

35

Francisco's ability during a period of one year ending within six months of the date of the filing of the petition; and (4) constructively abandoned the children who had been in the permanent or temporary managing conservatorship of CPS or an authorized agency for not less than six months, and (a) CPS or an authorized agency had made reasonable efforts to return the children to Francisco; (b) Francisco had not regularly visited or maintained significant contact with the children, and (c) Francisco demonstrated an inability to provide the children with a safe environment.

We must remember that a court may order termination of the parent-child relationship only if the court finds the allegations to be true by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2010). The standard "clear and convincing" evidence is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Spangler v. Tex. Dep't of Protective & Regulatory Servs.*, 962 S.W.2d 253, 256 (Tex. App.—Waco 1998, no pet.).

The majority only addresses the finding that Francisco had engaged in conduct which endangered the physical or emotional well-being of the children. The majority correctly points out that this conduct cannot be considered an isolated act but, rather, a voluntary, deliberate, and conscious course of conduct. For this, the majority relies upon Francisco's rather foggy description of what the majority calls an "inappropriate relationship" with a person whom Francisco described as being underage. The evidence upon which this rests is the following

36

exchange during the trial. On direct examination of Francisco,[17] the following exchange occurred:

> Q. Okay. Now, you got in trouble in Wisconsin, right?
>
> A. Yes. Correct.
>
> Q. You were having – your girlfriend was underage?
>
> A. Yes. Correct.

That is the sole source for the assumption that Francisco engaged in an inappropriate relationship with a child. One must infer that there was an inappropriate relationship and simple inferences not based on clear and convincing evidence will not support such a finding. One could just as easily infer that he had a young female friend to whom he had given a beer and was convicted of that offense—a much less serious offense. At any rate, Francisco's other testimony was that he had been placed on some kind of probation for whatever offense he committed, but he failed to live up to the terms of his probation and moved to Texas. After he had lived in Texas, he (rather naively) went to Dallas to apply for legal residency status; when the prior criminal offense was discovered, he was deported. Of course, whatever conduct Francisco perpetrated in Wisconsin occurred before he even met Edna. One must calculate, then, that since the elder of the two children Francisco sired by Edna was over fifteen years old at the time of trial, the incident for which he was convicted had taken place not less than sixteen years before the time the order

---

[17]Francisco appeared during the trial only for his testimony by telephone through an interpreter. He was unable to attend the trial because of his deportation to Mexico.

terminating his parental rights was entered.

The commission of a very unclear offense (the gravity of which is unproven) and his failure to live out the terms of a probated sentence over a decade and a half before is hardly clear and convincing evidence that Francisco engaged in a voluntary, deliberate, and conscious course of conduct which endangered the physical or emotional well-being of his children—children who were not even yet thought about, much less conceived. There is no clear and convincing evidence here.

As to the other findings by the trial court upon which the termination was based, there appears to be absolutely no evidence at all to support them.

When one considers the finding that Francisco knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children, Francisco's testimony that he believed the children to have been in perfectly acceptable surroundings and that Edna had not abused drugs or alcohol when they were together is not controverted. Francisco testified that his father saw the children on many occasions and made no such report of mistreatment, neglect, or maltreatment to him. Conversely, Francisco said that he thought (erroneously, it turns out) that Edna was a good mother to the children. Erroneous information about children who are hundreds of miles away does not constitute knowing conduct.

As to the finding that Francisco failed to support the children in accord with his ability

38

during a period of one year ending within six months of the date of the filing of the petition, the evidence is once again uncontroverted that Francisco elicited the aid of his father (who apparently made regular trips in the area in which the children were located) in delivering things to his children. He would then reimburse his father by giving his mother funds in Mexican currency. Francisco only made $400.00 per month, but asked if he needed to get a second job to send more money than he had in the past. There is a simple lack of any evidence that Francisco was not supporting his children in accord with his ability to pay; except for the testimony he provided as to his income, there is no other evidence of ability (or inability) to pay.

There is simply no evidence at all that the requirements of Section 161.001(a)(N) of the Texas Family Code have been satisfied. To commence, although there is ample evidence that CPS had been appointed temporary managing conservator of the children, there is simply no evidence at all that Francisco constructively abandoned the children, that CPS had made reasonable efforts to return the children to Francisco, or that there was any evidence that he had demonstrated an inability to provide the children with a safe environment, each of which is required to be proven. There was no home study of Francisco's situation and there was no attempt to return the children to him in the record. Francisco testified that he spoke to the children on the telephone on a regular basis, but was constrained from visiting them personally because he had been deported.

It is obvious that Francisco's role in this trial was that of the forgotten man. Perhaps if the

39

State had truly considered his role as the father of the children, it could have obtained copies of the Wisconsin papers to affirmatively show what crime Francisco had committed there. It chose not to do that. Was it a heinous crime? Who knows? Perhaps if CPS had considered the importance rightly placed on the value of the parent and child relationship between Francisco and his children, its agents would have seen to the commission of a home study of Francisco's home. It did not. Perhaps if some request for support was made by CPS to Francisco during the time that the children were under CPS conservancy, he would have provided what he could afford. There is no evidence that this took place.

I would affirm the termination of the parent and child relationship as to Edna, but I would reverse the termination as it pertains to Francisco.


Bailey C. Moseley
Justice


Date Submitted:    June 29, 2011
Date Decided:      August 16, 2011