Opinion issued March 1, 2012.


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-11-00387-CV

———————————

In re DC, KR, CR, RR, JC, MR, and JR



 



 

On Appeal from the 306th District Court 

Galveston County, Texas



Trial Court Case No. 09CP0047

 



 

MEMORANDUM OPINION

          After the mother
voluntarily terminated her parental rights to her eight children, the trial
court entered an order involuntarily terminating the parental rights of the
children’s fathers.  In this appeal, we
consider (1) whether one of the fathers was properly served with citation
before the trial, and (2) whether there was legally and factually sufficient
evidence (a) to terminate the fathers’ parental rights under section 161.001 of
the Texas Family Code, and (b) whether such termination was in the best interest
of the children.  We affirm.

BACKGROUND

          Lauren[1] is the mother of eight
children.  Her eldest son, Derek, was
born when she was a juvenile living with her parents in Florida.  Derek’s father is deceased, thus, Derek is not
involved in this appeal.  

While she was living with her parents, Lauren had a relationship with
Gary, and in 1997, she gave birth to Darren, Gary’s son.  Darren tested positive for cocaine at birth,
and HRS, the Florida equivalent of the Department of Family and Protective
Services [“DFPS or the Department”] became involved. Gary has never sought
custody, provided support, or been involved with raising Darren at all.  Lauren testified that Gary was abusive, that
he had been convicted of committing a lewd, lascivious, or indecent act on a
child, his younger cousin, and that he had been sentenced to 6 years’
confinement and required to register as a sex offender.  The record also shows a 2009 conviction for possession
of cocaine.

Lauren soon became involved with Raymond, and in 1999, gave birth to
his daughter, Kasey. When Kasey was born, Lauren was in rehab, so Kasey was in
a foster home for four months.  When
Kasey was returned to Lauren, Raymond supported them financially and was
involved in their lives. In 2000, Lauren and Raymond had a second daughter,
Caitlyn.  Lauren and Raymond were married
in April 2001.  

In 2002, Lauren and Raymond had a son, Raymond, Jr.  Lauren testified that Raymond began physically
abusing her when Kasey was born, and that at some point she got tired of it and
moved back in with her mother.  During
this time period, Lauren reconciled with Gary for a brief time, and soon
thereafter gave birth to Gary’s second son, Jason, in 2005.  Again, Gary has neither provided support nor
maintained any contact with either of his sons beyond asking how they were
doing whenever he happened to see Lauren.

The reconciliation with Gary did not last long, and Lauren soon
returned to Raymond.  In 2007, Lauren and
Raymond had another daughter, Mary.

The record shows that Raymond had multiple convictions in Florida for
domestic violence assault and domestic violence battery.  Also, Lauren had petitioned for and received
a protective order from a Florida court. 
Lauren testified that Raymond had broken her wrist, stabbed her with a
screwdriver, and beaten her repeatedly. 
She had also seen him hit Darren in the head with a broomstick, and
several staples were required to close the wound.  Raymond often told Lauren that if she left
him, he would kill her and her children.

Lauren testified that Raymond’s abuse finally stopped when he was
deported to Honduras.  Before he was
deported, Raymond told Lauren to take the kids and go to Texas and he would
come there as well.  Raymond also told
Lauren to contact his aunt, Aurelia, who lived in Texas.  Lauren called Aurelia, who met them at the
bus stop.  However, when Aurelia realized
that there were seven children, three of whom did not belong to Raymond, she
told Lauren that she could not move in with her.

Lauren then stayed with the children at the Star of Hope Mission in
Houston for four months, before moving to Galveston in the spring of 2008 to
look for work.  While in Galveston,
Lauren and the children stayed at a shelter, where they met Ms. Goins, a
vice-principal at the local high school who volunteered at the shelter at
night.  During that time, Ms. Goins would
help Lauren, who was pregnant, by taking some of the children with her on
occasion.  Lauren also let Ms. Goins’
adult daughter, Dana, take Jason to live with her because Jason, who was
18-months-old at the time, was being physically abused by his older siblings.

Lauren gave birth to her fifth child with Raymond, James, in August
2008, and two weeks later Hurricane Ike hit the island.  Ms. Goins took the children, including the
two-week-old infant, home with her and they rode out the storm in her home.  Lauren was not with them because she had been
flown by Life Flight to Austin because of post-partum hemorrhaging.

Soon, Ms. Goins and the children were able to evacuate to Ms. Goins’
sister’s house in LaMarque, where they stayed for two and a half weeks.  Ms. Goins eventually called the Department
because she was not able to keep the children, as she too had been left
homeless by the storm.

The children were split up and went to several different foster homes,
before being reunited with Lauren in Galveston in January 2009.  Ms. Goins and her daughter, Dana, continued
to visit the children while they were in foster care.

Lauren eventually received money from DEHAB, an organization that
helped those displaced by the hurricane. 
She sent $1500 of this money to Raymond in Honduras because he said that
he was going to come join them, despite the fact that he had been
deported.  Lauren testified that, all
together, she had sent Raymond approximately $3000.  Raymond knew that his children had been
living in shelters, but he never sent any money to Lauren to help support his
family.  

Lauren and the children were first given an apartment in the Victorian
condos, but they were soon evicted because Lauren ran up a $1000 phone bill
calling Honduras and her oldest son, Derek, punched holes in the walls.  Ms. Goins then went to DEHAB and helped
Lauren to get a placement in a five bedroom historic Victorian house.  The Department bought the family air
mattresses, but Lauren rented out the extra rooms and air mattresses to
vagrants and made the children sleep together in an unair-conditioned,
unfurnished room.

The Department became involved with the children at this point because
7-year-old Jason was discovered wandering around at a local restaurant alone,
looking for his mother.  As a result of
the Department’s investigation, a safety plan was put into place that prevented
Lauren’s newest boyfriend, Carlos, from having any contact with her. Carlos was
abusive, he drank and used drugs, and there were allegations that he was
teaching the children how to steal.  Lauren
was caught deliberately violating the safety plan, and the Department took
custody of the children.

At the time of trial, Lauren’s oldest son, Derek, had been placed in a
group home and was doing well.  Darren,
was in a foster home, which he liked. 
However, Darren has issues with acting out sexually with younger
children and would likely be removed from this placement.  He did not want to be placed with relatives
in Florida.  The three girls, Kasey,
Caitlyn, and Mary, had been placed with Ms. Goins.  They were doing well in school and had
perfect attendance.  Ms. Goins testified
that she would like to adopt all three girls if possible.  Raymond, Jr. was initially placed in Florida
with his grandfather, along with Derek and Darren.  When Derek and Darren were returned to Texas
because their grandfather was unable to control them, Raymond Jr. remained in
Florida with his grandfather.  When the
grandfather died, Raymond Jr. was placed with a relative of his grandfather, and
he has done well in that placement. 
Jason has been placed with Ms. Goins’ daughter, Dana, with whom he had
lived for several years, even before CPS became involved.  Dana testified that Jason is doing well and
that she would like to adopt him if possible. 
The infant, James, was initially placed in a foster home, in which he
seemed very non-responsive.  He has,
however, been moved to a new foster home and is doing much better.  When his family last visited he was active,
responsive, and showed much improvement.

RETURN OF
SERVICE

          In his first issue on appeal, Raymond
contends the trial court “erred in allowing [DFPS] to proceed with the case . .
. when at the time the case was called for trial on December 10, 2010 . . .
there was no evidence in the court’s file that proper service had been effected
upon [him].” Specifically, Raymond argues that on the date the case was called
for trial, the return of service on file with the court had not been translated
from Spanish to English and did not comply with Tex. R. Civ. P. 105[2]
because it shows that the process server both received and delivered the
citation at the same time—a physical impossibility.  DFPS responds that the return of service was
properly amended before judgment.

 

 

Relevant Facts

          This suit was filed on June 22,
2009.  The Department sought custody and
identified Raymond as the father of several of the children.  In the petition, Raymond’s address was listed
as “unknown.”  An order for protection of
a child in an emergency was signed that same day.  The order assigned Raymond appointed counsel,
Christine Mangle, who appeared on Raymond’s behalf during the pretrial
proceedings. At a Permanency hearing on April 13, 2010, the Court noted that
Raymond “is in Honduras and is not served.”

          On November 3, 2010, a faxed copy of
return of service was filed in the trial court. 
The return was in Spanish, and it showed that the process server had
served Raymond in Honduras.  The return,
however, was defective, in that it showed that the process server, a Honduran
attorney, had both received and delivered the legal documents on October 8,
2011 at 7 a.m.

          On December 3, 2010, the original of
the above-described faxed return of service was filed in the trial court.  The document was still in Spanish, and the
return and delivery times were still the same.

          On December 6, 2010, at a pretrial
conference, Raymond’s counsel pointed out to the trial court that the court
records did not conclusively establish service upon Raymond in Honduras.  Counsel argued that to be admissible under
Texas Rule of Evidence 1009, foreign language documents had to be translated
into English, be accompanied by an affidavit from a qualified translator, and
be served upon all parties 45 days prior to trial.  The trial court initially agreed, sustained
counsel’s objection, and ruled that DFPS could not proceed with the termination
suit against Raymond.

          DFPS filed a motion to reconsider,
citing to the trial court cases that permit defective returns of service to be
freely amended anytime before judgment. 
The trial court granted DFPS’s motion to reconsider, stating, “I’m going
to grant the motion to amend and order Ms. Gilmore to amend in due haste.”

          The trial commenced on December 10,
2010, and resumed, then concluded on January 18, 2011.  On that same day, the trial court entered an
order granting permission for DFPS to amend and correct the return of service
on Raymond.

          On February 18, 2011, an amended
return of service was filed.  The amended
service corrected the deficiencies complained of in the earlier return of service.  Specifically, the return of service had been
translated into English and was accompanied by an affidavit from the qualified
translator.  The amended return also
showed that the process server had received the legal documents on October 6,
2010, at 2 p.m. and served them on Raymond on October 8, 2010 at 7 a.m.  The return of service by Leobildo Cabrera was
sworn to before a notary public, Mario Melgar Portillo.

          The trial court’s final judgment
terminating Raymond’s parental rights was signed on April 26, 2011.

Amendment of Citation

      Texas procedural law and constitutional
due process require that a defendant be served, waive service, or voluntarily
appear before judgment may be rendered. See Tex. R. Civ. P. 124; Peralta v. Heights Med. Ctr., Inc,
485 U.S. 80, 84–87, 108 S. Ct. 896, 898–900 (1988); Kao Holdings, L.P. v.
Young, 261 S.W.3d 60, 61–62 (Tex. 2008). “A trial court has ‘no more solemn
judicial obligation than that of seeing that no litigant is unjustly saddled
with a judgment in the absence of notice and a hearing.’”Marrot Commc’ns,
Inc. v. Town & Country P’ship, 227 S.W.3d 372, 376 (Tex. App.—Houston [1st
Dist.] 2007, pet. denied) (quoting Finlay v. Jones, 435 S.W.2d 136,
138–39 (Tex. 1968)).

“[I]n
order for a default judgment to be properly rendered, the record must
affirmatively show, at the time the
default judgment is entered, either an appearance by the defendant,
proper service of citation on the defendant, or a written memorandum of
waiver.” Id. at 378; see also Mapco, Inc. v. Carter, 817 S.W.2d
686, 687 (Tex. 1991). “Actual notice to a defendant, without proper service, is
not sufficient to convey upon the court jurisdiction to render default judgment
against him.” Wilson v. Dunn, 800 S.W.2d 833, 836 (Tex. 1990).



There are no presumptions in favor of valid issuance,
service, and return of citation in an attack on a default judgment on direct
appeal. See Uvalde Country Club v. Martin Linen Supply Co., Inc., 690
S.W.2d 884, 885 (Tex. 1985). “Strict compliance with the Rules of Civil
Procedure relating to the issuance of citation, the manner and mode of service,
and the return of process is necessary to sustain a default judgment . . . .” Laidlaw
Waste Sys., Inc. v. Wallace, 944 S.W.2d 72, 73–74 (Tex. App.—Waco 1997,
writ denied) (citing Primate Constr., 884 S.W.2d 151, 152 (Tex. 1994); Wilson
v. Dunn, 800 S.W.2d 833, 836 (Tex. 1990);
McKanna v. Edgar, 388 S.W.2d 927, 929 (Tex. 1965); Armstrong v. Minshew, 768 S.W.2d 883, 884 (Tex. App.—Dallas 1989,
no writ)).  In this case, Raymond
challenges the sufficiency of the return of process.

Rule 108a, which
governs service of process in foreign countries, provides that “[p]roof of
service may be made as prescribed by the law of the foreign country, by order
of the court, by Rule 107, or by a method provided in any applicable treaty or
convention.” Tex. R. Civ. P.
108a. Rule 107 provides, in pertinent part, “The return
of the officer or authorized person executing the citation shall be endorsed on
or attached to the same; it shall state when the citation was served and the
manner of service and be signed by the officer officially or by the authorized
person.” Tex. R. Civ. P. 107.  “The return of citation by an authorized
person shall be verified.”  Id.  Additionally, “[t]he officer or authorized person to whom
process is delivered shall endorse thereon the day and hour on which he
received it[.]” Tex. R. Civ. P.
105.

          Here, the issue is whether the proof
of service, i.e., the return, complied with Rules 105 and 107, and, if it did
not, whether the trial court properly allowed it to be amended.  Raymond argues that the return shows either that it
did not comply with Rule 107 because it did not properly state when the
citation was served, or it did not comply with Rule 105 because it did not
properly state when it was received. 
Because the return shows the same day and time for both receipt and
service, Raymond contends one must be wrong, thus invalidating the return.

          DFPS argues that even if the November
3, 2010 return of service was defective, it was corrected when the trial court
permitted DFPS to amend the return.  We
agree.

Rule 118 of the Texas Rules of Civil Procedure provides:

At any time
in its discretion and upon such notice and on such terms as it deems just, the
court may allow any process or proof of service thereof to be amended,
unless it clearly appears that material prejudice would result to the
substantial rights of the party against whom the process issued.

 



Tex. R. Civ. P. 118 (emphasis added).

Rule 118 of the Texas Rules of Civil Procedure provides for
the amendment of the return to show the true facts of service. Primate
Constr. Co., 884 S.W.2d at 153; Higginbotham v. General Life & Acc.
Ins. Co., 796 S.W.2d 695, 696–97 (Tex. 1990); London v. Chandler,
406 S.W.2d 203, 204 (Tex. 1966). If the facts recited in the officer’s return,
pre-printed or otherwise, are incorrect and do not reflect proper service, then
the plaintiff should move to amend the return. Primate Constr. Co., 884
S.W.2d at 153.  The Texas Supreme Court
has even held that the trial court may enter a postjudgment order granting
amendment of a return of citation pursuant to rule 118
during its plenary power. Higginbotham, 796 S.W.2d at 696–97.

          Here, the return was amended prior to
the entry of judgment, and there is no requirement that it be amended before
proceeding to trial.  The amended return
corrects the problems with Rule 105 and 107 by clarifying that the process
server received the document on October 6, 2010, at 2 p.m. and served it on Raymond
on October 8, 2010 at 7 a.m.

          Raymond, however, also complains that the initial return
was in Spanish, and because it was not translated into English until after
trial, it violated Rule of Evidence 1009, which requires that all foreign
documents to be admitted at trial must be translated 45 days before trial and
be accompanied by an affidavit from a qualified translator. Tex. R. Evid. 1009(a)

          However, rule 1009 is a rule of evidence governing the
admission of foreign documents of trial. 
Raymond has cited no cases in which rule 1009 requires the translation
of foreign returns of service into English, or that such a translation could
not be done in an amended return while the trial court still had plenary
power.  We have found no authority
holding that rule 1009 trumps rule 118, which permits amended returns of
service “[a]t any time.” Tex. R. Civ. P.
118.

          Further, we note that, even if applicable, rule 1009
provides that “[t]he court, upon motion of any party and for good cause shown,
may enlarge or shorten the time limits set forth in this Rule.” Tex. R. Evid. 1009(f).

          Because the amended return, which was filed after trial but
before judgment, corrected the only defects of which Raymond complained, we
conclude that the trial court had jurisdiction to enter judgment against
Raymond because he had been personally served.

          We overrule Raymond’s first issue on appeal.

SUFFICIENCY
OF THE EVIDENCE TO SUPPORT TERMINATION

          In their remaining issues on appeal, Raymond and Gary contend there was
legally and factually insufficient evidence to terminate their parental rights
under section 161.001 of the Texas Family Code, or that such terminations would
be in the best interest of the children. 
Tex. Fam. Code Ann. § 161.001 (Vernon 2011).

Standard of Review

A parent’s right to
“the companionship, care, custody, and management” of his children is a
constitutional interest “far more precious than any property right.” Santosky
v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982) (internal
citation omitted). The United States Supreme Court has emphasized that “the
interest of parents in the care, custody, and control of their children is
perhaps the oldest of the fundamental liberty interests recognized by this
Court.” Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060
(2000). Likewise, the Texas Supreme Court has also concluded that “[t]his
natural parental right” is “essential,” “a basic civil right of man,” and “far
more precious than property rights.” Holick v. Smith, 685 S.W.2d 18, 20
(Tex. 1985) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208,
1212 (1976)). Consequently, termination proceedings should be strictly
scrutinized. Id. 

Because
termination “is complete, final, irrevocable, and divests for all time that
natural right . . . , the evidence in support of termination must be clear and
convincing before a court may involuntarily terminate a parent's rights.” Id.
(citing Santosky, 455 U.S. at 747–48, 102 S. Ct. at 1391–92; Richardson
v. Green, 677 S.W.2d 497, 500 (Tex. 1984)). Clear and convincing evidence
is “the measure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.” Tex. Fam.Code Ann.
§ 101.007 (Vernon  2008); In re
J.F.C., 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is
“clear and convincing,” the Texas Supreme Court has held that the traditional
legal and factual standards of review are inadequate. In re J.F.C., 96
S.W.3d at 264–66.

In
conducting a legal-sufficiency review in a parental-rights termination case, we must determine whether the evidence,
viewed in the light most favorable to the finding, is such that the fact finder
could reasonably have formed a firm belief or conviction about the truth of the
matter on which DFPS bore the burden of proof. See id. at 266. In
viewing the evidence in the light most favorable to the finding, we “must
assume that the factfinder resolved disputed facts in favor of its finding if a
reasonable factfinder could do so,” and we “should disregard all evidence that
a reasonable factfinder could have disbelieved or found to have been
incredible.” In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005) (quoting In
re J.F.C., 96 S.W.3d at 266).

In conducting a factual-sufficiency
review in a termination-of-parental-rights case, we must determine
whether, considering the entire record, including both evidence supporting and
evidence contradicting the finding, a fact finder reasonably could have formed
a firm conviction or belief about the truth of the matter on which the State
bore the burden of proof.  In re C.H.,
89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence
is such that a reasonable fact finder could not have resolved the disputed
evidence in favor of its finding. In re J.F.C., 96 S.W.3d at 266. “If,
in light of the entire record, the disputed evidence that a reasonable fact
finder could not have credited in favor of the finding is so significant that a
fact finder could not reasonably have formed a firm belief or conviction, then
the evidence is factually insufficient.” In re H.R.M., 209 S.W.3d 105,
108 (Tex. 2006) (quoting In re J.F.C.,
96 S.W.3d 256, 266 (Tex. 2002)).



In proceedings to terminate the parent-child relationship
brought under section 161.001, DFPS must establish, by clear and convincing
evidence, one or more of the acts or omissions enumerated under subsection (1)
of section 161.001 and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon
Supp. 2011). Both elements must be established, and termination may not be
based solely on the best interest of the child as determined by the trier of
fact. Tex. Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).
“Only one predicate finding under section 161.001(1) is necessary to support a
judgment of termination when there is also a finding that termination is in the
child's best interest.” In re A.V., 113 S.W.3d 355, 362 (Tex. 2003).

Endangerment

In Raymond’s second issue and Gary’s
second and third issues, appellants argue that the evidence is legally and
factually insufficient to support termination of their parental rights under Texas Family
Code sections 161.001(1)(D) and (E).

A trial court only
needs to make one finding of parental misconduct under section 161.001(1) of
the Family Code. In re A.V., 113 S.W.3d at 362. Section 161.001(1)(D)
provides that a “court may order termination of the parent-child relationship if
the court finds by clear and convincing evidence . . . that the parent has . . .
knowingly placed or knowingly allowed the child to remain in conditions or
surroundings which endanger the physical or emotional well-being of the child. .
. .” Tex. Fam. Code Ann. §
161.001(1)(D). Section 161.001(1)(E) provides that a court may order
termination if it finds by clear and convincing evidence that the parent has
“engaged in conduct or knowingly placed the child with persons who engaged in
conduct which endangers the physical or emotional well-being of the child.” Id
. § 161.001(1)(E).

“‘To endanger’ means to expose a child
to loss or injury or to jeopardize a child’s emotional or physical health.” Jordan
v. Dossey, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet.
denied); see also In re T.N., 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no
pet.) (citing In re M.C., 917 S.W.2d 268, 269 (Tex. 1996) (quoting Boyd,
727 S.W.2d at 533)). A child is endangered when the environment creates a
potential for danger that the parent is aware of but disregards. Jordan,
325 S.W.3d at 721; In re M.R.J.M., 280 S.W.3d 494, 502 (Tex. App.—Fort Worth
2009, no pet.). Subsection (D) requires a showing that the environment in which
the child is placed posed a danger to the child’s physical or emotional health,
and it permits termination based on a single act or omission by the parent. In
re L.C., 145 S.W.3d 790, 795–96 (Tex. App.—Texarkana 2004, no pet.); see
Jordan, 325 S.W.3d at 721.

Inappropriate,
abusive, or unlawful conduct by persons who live in the child’s home or with
whom the child is compelled to associate on a regular basis in his home is a
part of the “conditions or surroundings” of the child’s home under section
161.001(1)(D). Jordan, 325 S.W.3d at 721; In re M.R.J.M., 280
S.W.3d at 502. Thus, although the focus of subsection (D) is on the child’s
living environment and not on the parent’s conduct, parental conduct may
produce an endangering environment. See Jordan, 325 S.W.3d at 721. For
example, abusive or violent conduct by a parent or other resident of the child’s
home, as well as illegal drug use and drug-related criminal activity, support a
conclusion that the children’s surroundings endanger their physical or
emotional well-being. In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth
2003, no pet.).



“Under subsection (E), the relevant inquiry is whether
evidence exists that the endangerment of the child’s physical well-being was the
direct result of the parent’s conduct, including acts, omissions, or failures
to act.” Id.; see also Jordan, 325 S.W.3d at 723 (“The relevant inquiry
is whether evidence exists that a parental course of conduct endangered the
child’s physical or emotional well-being.”). Termination under Subsection E
must be based on more than a single act or omission—the evidence must
demonstrate a voluntary, deliberate, and conscious course of conduct by the
parent. Jordan, 325 S.W.3d at 723; In re J.T.G., 121 S.W.3d at 125.
“Although ‘endanger’ means more than a threat of metaphysical injury or the
possible ill effects of a less-than-ideal environment, it is not necessary that
the conduct be directed at the child or that the child actually suffers
injury.” In re T.N., 180 S.W.3d at 383 (citing In re M.C., 917
S.W.2d at 269); see also In re J.O.A., 283 S.W.3d 336, 345 (Tex. 2009)
(holding that endangering conduct is not limited to actions directed toward
child); Jordan, 325 S.W.3d at 723 (holding that danger to child need not
be established as independent proposition and may be inferred from parental
misconduct even if conduct is not directed at child and child suffers no actual
injury). As a general rule, subjecting a child to a life of uncertainty and instability
endangers the child’s physical and emotional well-being. See In re S.D.,
980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); see also
Jordan, 325 S.W.3d at 724 (“Abusive and violent criminal conduct by a
parent can produce an environment that endangers the well-being of a child.”).

Danger to the child’s well-being may be
inferred from parental misconduct alone, and courts may look at parental
conduct both before and after the child’s birth. See Boyd, 727 S.W.2d at
533–34; In re D.M., 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no
pet.). 



Because the evidence concerning these two statutory grounds
for termination is interrelated, we consolidate our examination of it. See
In re J.T.G., 121 S.W.3d at 126 (citing In re S.D., 980 S.W.2d at
762 and In re B.R., 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ
denied) (recognizing link between parent’s conduct and child’s conditions and
surroundings)).

Endangerment
by Raymond

Raymond argues that because he had been deported by the time
DFPS took possession of the children, he could not have knowingly endangered
them.  Essentially, he argues, “how can
he be held responsible for the conduct of his wife a year [after he was
deported].”  DFPS responds that his
course of conduct leading to his deportation created the dangerous conditions
that endangered his children’s physical or emotional well-being.  We agree with DFPS.

The record shows that, while living with Lauren and the
children in Florida, Raymond was convicted multiple times of domestic assault
and battery. Danger to the child’s well-being may be inferred from parental
misconduct alone, and courts may look at parental conduct both before and after
the child’s birth. See Boyd, 727 S.W.2d at 533.

 Lauren testified that
Raymond broke her wrist, stabbed her with a screwdriver, and repeatedly beat
her during the time they were together, and that the abuse continued until
Raymond was deported. Raymond also hit Darren in the head with a broom,
requiring several staples to close the wound. See Jordan, 325 S.W.3d at
724 (“Abusive and violent criminal conduct by a parent can produce an
environment that endangers the well-being of a child.”); In re B.R., 950 S.W.2d 113, 119 (Tex. App.—El Paso. 1997, no writ)
(holding violent conduct directed at the other parent may be sufficient to
demonstrate course of conduct under Subsection E). 

The record also shows that Raymond’s arrests and convictions
eventually led to his deportation. 
Deportation, like incarceration, is a consequence of an action, and like
incarceration, deportation alone cannot establish a course of conduct
endangering a child.  See In re E.N.C., No. 06-10-00131-CV, 2011
WL 3570316, at *11 (Tex. App.—Texarkana Aug. 16, 2001, pet. filed) (analogizing
deportation to imprisonment).    However,
deportation, like imprisonment, is a factor that is properly considered when
assessing endangerment.  See Perez v. Tex. Dep’t of Protective &
Regulatory Servs., 148 S.W.3d 427, 437 (Tex. App.—El Paso 2004, no
pet.).  A deported parent, like an
incarcerated parent, is absent from the child’s daily life and unable to
provide support. See In re S.M.L., 171 S.W.3d 472, 479
(Tex. App.—Houston  [14th Dist.] 2005, no
pet.). A parent who repeatedly commits criminal acts subjects himself to the
possibility of deportation and negatively impacts a child’s living environment
and emotional well-being. See id.  Generally,
conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. In
re K.R.L., 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Finally, we note that, since his deportation, Raymond has
made no attempts to remain in contact with his children, nor has he provided
them any support.  In fact, the record
shows that Raymond was having Lauren send money to him in Honduras, even though
he knew that his children had been living in shelters.  See In
re V.V., 349 S.W.3d 548, 557 (Tex. App.—Houston [1st Dist.] 2010, pet.
denied) (holding evidence of incarceration, abuse of mother, and failure to
contact or support child sufficient to show that father engaged in course of
conduct that endangered child).

Viewing the evidence of repeated acts of domestic violence,
resulting in convictions and, ultimately, deportation, along with evidence of
failure to contact or support the children, in the light most favorable to the
verdict, the trial court could reasonably have formed a firm belief or
conviction that Raymond engaged in a course of conduct and placed or allowed
the children to remain in conditions that endangered their physical or
emotional well-being.  Also, considering
the entire record, including both evidence supporting and evidence
contradicting the finding, the trial court could have formed a firm conviction
or belief that Raymond engaged in a course of conduct and placed or allowed the
children to remain in conditions that endangered their physical or emotional
well-being.

Accordingly, we overrule Raymond’s second issue on appeal.

 

Endangerment
by Gary

Gary argues that his “strongest argument is that he did not
know and was not aware of the environment being endangering to his
children.”  He argues that he had no
knowledge that Lauren had taken their children to Texas, and that he could not
be responsible for the conditions in which they lived while there.  DFPS argues that Gary’s own course of conduct
caused the uncertainty and instability in the childrens’ lives.  We agree with DFPS.

The evidence shows that when Darren was born, he tested
positive for cocaine.  Gary was not
involved in Darren’s life at all at the time, and custody was given to Lauren’s
parents.  Gary never sought any custodial
rights, nor did he ever provide any support. Gary has never been involved with
either of his children at all, other than asking how they were doing whenever
he happened to see Lauren.  Lauren also
testified that Gary abused her physically and mentally when they were “around
each other.”  See In re B.R., 950 S.W.2d at 119 (holding violent conduct directed
at the other parent may be sufficient to demonstrate course of conduct under
Subsection E).

There was evidence in the record that Gary had been
convicted in February 2000 of committing a lewd, lascivious or indecent act
upon a child, and that he received a six year sentence. He was also required to
register as a sex offender. Lauren testified that Gary had molested his cousin
and sister.  There was also evidence of a
2009 conviction for possession of cocaine. 
At the time of trial, Gary was still in prison for this crime and had no
known release date.  Imprisonment of the
parent is a factor to consider on the issue of endangerment. Boyd, 727
S.W.2d at 533. However, imprisonment by itself is not
enough to constitute engaging in conduct that endangers the emotional or
physical well-being of the child. Boyd, 727 S.W.2d at 533–34. On the
other hand, if the evidence, which includes imprisonment,
shows a course of conduct that has the effect of endangering the physical or
emotional well-being of the child, a finding of endangerment is supportable. Boyd,
727 S.W.2d at 533–34. Conduct that subjects a child to a life of uncertainty
and instability endangers the physical and emotional well-being of a child.  In re K.R.L., 129 S.W.3d at 739.

Lauren also testified that Gary was aware that Raymond was
abusing her.  She testified that one day
she had Caitlyn with her, and they had dropped off one of the boys at school
when she saw Gary.  Gary inquired about
his son, when Raymond arrived and got angry when he saw Lauren and Gary
talking.  Raymond pulled Lauren’s arm
into the car and attempted to drive away, breaking her arm.  Gary witnessed this abuse, but never
attempted to have his children removed from Raymond’s home.  See In re J.M.M., 80 S.W.3d 232,
241–42 (Tex. App.—Fort Worth 2002, pet. denied) (holding evidence legally and
factually sufficient under sections D and E to terminate mother’s parental
rights based in part on evidence that mother placed children with physically
abusive father).  Here, Gary allowed his
children to be raised by a man he knew was abusive.

Viewing the evidence of abuse towards Lauren, repeat
convictions and imprisonments for sexual abuse of a child, then selling
cocaine, permitting his children to be raised by an abusive father, along with
evidence of failure to contact or support the children, in the light most
favorable to the verdict, the trial court could reasonably have formed a firm
belief or conviction that Gary engaged in a course of conduct and placed or allowed
his children to remain in conditions that endangered their physical or
emotional well-being.  Also, considering
the entire record, including both evidence supporting and evidence
contradicting the finding, the trial court could have formed a firm conviction
or belief that Gary engaged in a course of conduct and placed or allowed the
children to remain in conditions that endangered their physical or emotional
well-being.

Accordingly, we overrule Gary’s second and third issues on
appeal.

In light of our finding that the evidence was legally and
factually sufficient to support termination of Raymond’s and Gary’s parental
rights under sections 161.001(1)(D) and (E), we need not address whether the
evidence is sufficient to support termination under other sections of the
statute.  See In re A.V., 113 S.W.3d at 362 (“Only one predicate
finding under section 161.001(1) is necessary to support a judgment of termination
when there is also a finding that termination is in the child's best interest.”).  

BEST INTEREST OF THE CHILDREN

In Gary’s seventh issue and Raymond’s third issue, appellants
argue that the evidence is legally and factually insufficient to support the
trial court’s finding that termination of their parental rights was in the best
interest of their children.

There is a strong presumption that the best interest of the
child will be served by preserving the parent-child relationship. In re. R.R.,
209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of
the child in a safe environment is also presumed to be in the child’s best
interest. Tex. Fam. Code Ann. §
263.307(a) (Vernon 2008). Among others, the following factors should be
considered in evaluating the parent’s willingness and ability to provide the
child with a safe environment: the child’s age and physical and mental
vulnerabilities; the frequency and nature of out-of-home placements; the willingness
and ability of the child’s family to seek out, accept, and complete counseling
services and to cooperate with and facilitate an appropriate agency’s close
supervision; and whether an adequate social support system consisting of an
extended family and friends is available to the child. Id. § 263.307(b).



The Texas Supreme Court has set out some additional factors
that courts can consider when determining the best interest of the child,
including: (1) the desires of the child; (2) the emotional and physical needs
of the child now and in the future; (3) the emotional and physical danger to
the child now and in the future; (4) the parental abilities of the individuals
seeking custody; (5) the programs available to assist these individuals to
promote the best interest of the child; (6) the plans for the child by these
individuals or by the agency seeking custody; (7) the stability of the home or
proposed placement; (8) the acts or omissions of the parent that may indicate
that the existing parent-child relationship is not a proper one; and (9) any
excuse for the acts or omissions of the parent. Holley v. Adams, 544
S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court
need not have evidence of every element listed in order to make a valid finding
as to the child’s best interest, especially when there is undisputed evidence
that the parental relationship endangered the child. In re C.H., 89
S.W.3d 17, 27 (Tex. 2002). While no one factor is controlling, analysis of a
single factor may be adequate in a particular factual situation to support a
finding that termination is in the best interest of the child. See In re
A.P., 184 S.W.3d 410, 414–15 (Tex. App.—Dallas 2006, no pet.) (citing In
re C.H ., 89 S.W.3d at 27).

Best Interest of
Raymond’s Children—Kasey, Caitlyn, Raymond, Jr., Mary, and James

 

          Raymond argues that termination was
not in the best interest of his children because “DFPS, at best, was
lackadaisical in placing the children with family members” in violation of Tex. Fam. Code
Ann. § 262.114 (Vernon
Supp. 2010). Specifically, Raymond argues that his aunt, Aurelia, testified
that she would be willing to take all eight children, but that DFPS never
conducted a home study regarding placement with her.  There was evidence that Aurelia missed her
meeting with DFPS because of a conflicting court date, and that her daughter
called repeatedly to reschedule the meeting, but DFPS never did so.

            In contrast, DFPS employee A. Snoke,
testified that Aurelia wanted to see pictures of the children so that she could “pick and choose which
children she wanted.”  However, Aurelia
did not show up for the meeting.  CASA
representative Cheatham, who spoke Spanish, called Aurelia several times
thereafter to reschedule the meeting, but Aurelia never returned the calls, so
DFPS quit trying to contact her.  Several
months later, Aurelia’s daughter called to try and reschedule the meeting, but
DFPS made the decision not to proceed with a home study because the final
termination hearing was too close.

Raymond argues that, because no home study was ever done
regarding a possible placement with Aurelia, termination would not be in the
best interest of his children.  However,
courts have held that the failure to conduct or obtain a home study pursuant to
section 262.114 is not a bar to termination. In re G.B. II, No. 10-10-00244-CV, 2011 WL 2151283, at *1  (Tex. App.—Waco June 1, 2001, no pet.); Frank
R. v. Tex. Dep’t of Family & Protective Servs., No. 03-09-00436-CV,
2010 WL 1507832, at *2–3 (Tex. App.—Austin April 13, 2010, no pet.); In the
Interest of J.F., No. 02–08–00183–CV, 2007 WL 2963690, *6–8 (Tex. App.—Fort
Worth Oct. 11, 2007, pet. denied); In the Interest of C.C., No. 02-04-00206-CV,
2005 WL 1244672, *6–7 (Tex. App.—Fort Worth May 26, 2005, no pet.). 

Because the lack of a home study is not outcome
determinative, we consider other factors in determining whether termination was
in the children’s best interest.  First,
we note that there was evidence that, despite her testimony to the contrary,
Aurelia did not want all of the children. 
In fact, Aurelia turned away the entire family when Lauren called from
the bus station because she did not know about the three children who had not
been fathered by Raymond.  She allowed
the entire family to live in a shelter and provided only $50 dollars toward
their support, even though she knew they were living in a shelter.  There was also evidence from which the trial
court have concluded that Aurelia did not cooperate with DFPS because, after
missing her scheduled appointment, she did not return their numerous calls.  There was no evidence that the children knew
Aurelia or wanted to live with her.  From
this evidence, the trial court could have concluded that placement with Aurelia
would not be in the best interest of the children.

          The trial court also could have
considered Raymond’s abuse of Lauren and Darren, as well the fact that Raymond
did not contact or support his children after being deported as evidence that
“the existing parent-child relationship is not a proper one.” Holly, 544 S.W.2d at 271–72. And, when
he did live with the children, Raymond allowed the boys to do whatever they
wanted, but he mentally abused the girls by being very controlling, not
allowing them to have friends, and limiting their role in the family to cooking
and cleaning.

There was evidence that Raymond’s relationship with his
children was non-existent at the time of trial. 
Even though not prohibited from doing so by his deporation, Raymond had
made no effort to remain in contact with his children.  And, not only did Raymond not provide any
support for his children, he in fact took money from them when he had Lauren
send him $3000 in Honduras, even though he knew his children had been living in
shelters.  There is also no evidence in
the record of any excuse for Raymond’s acts or omissions.  Id.

          In considering future plans for the
children and the stability of their future homes, we note that Raymond provided
no plans for the children other than a possible placement with Aurelia, which
we have discussed.  The fact remains,
however, that Raymond is prohibited from entering the country, and he did not
provide evidence about any plans to bring the children to live with him.  Thus, reunification with his children seems
unlikely.

          In contrast, Ms. Goins testified that
Kasey, Caitlyn, and Mary had been living with her since June 2009.  When they first began living with Goins,
their grades and attendance at school were bad, but now they are on the honor
roll and have perfect attendance.  Goins
testified that she would like to adopt the girls if possible, and she believes
the girls would like to live with her permanently. She has allowed and
encouraged the girls to remain in contact with their brothers, but does not
feel that they should all live together since the older brothers were often
violent and controlling, and Darren had shown some issues with acting out
sexually.  Ms. Goins is an assistant
principal and testified that her salary would be sufficient to allow her to
raise and care for all three girls.

          The record showed that Raymond, Jr.
had initially been placed with his maternal grandfather in Florida, but when
the grandfather died, Raymond Jr. went to live with his maternal
great-aunt.  His CASA representative,
Cheatham, testified that Raymond, Jr. was doing well in this placement, and
that it would be in his best interest to remain in that placement.

          James, the infant who was born right
before the hurricane, was in a foster home and was doing well.  In an earlier placement, he had been
non-verbal and standoffish, but DFPS had recently put him in a new foster home
and he had shown much improvement.  His
sisters had visited him and he had played with them and interacted with them in
a way that he had never done while in the previous placement.  His CASA representative testified that he
seemed very happy in his new placement, and was receiving special education.

          Considering these factors, we conclude
that legally and factually sufficient evidence supports the trial court’s
finding that termination was in the best interest of Kasey, Caitlyn, Mary,
Raymond Jr., and James.

Best
Interest of Gary’s Children—Darren and Jason

          The record shows that Gary has never
had a role in his sons’ lives, and has been incarcerated for much of their
lives.   He has never maintained any
contact with them or provided any form of support whatsoever.  When Gary was in prison, Lauren sent him a
picture of his son, but Gary never responded. 
Gary physically abused Lauren when they were together. He then allowed
his children to be raised by Raymond, even though he had witnessed Raymond
physically abusing Lauren.  From this
evidence, the trial court could have concluded that a child in Gary’s custody
would face emotional and physical danger now or in the future.  Gary offered no excuse for his behavior.  Id.

          Regarding plans for the childrens’
future placements, we note that a home study was done of Gary’s sister in
Florida.  However, Darren did not want to
move to Florida, because he wanted to remain near his older brother, Derek, who
was in a group home in Texas.

          At the time of trial, Darren was in a
foster home in Texas, where he was happy and had been doing well.  However, there was evidence that Darren had
acted out in an inappropriately sexual manner, and likely would be moved in the
near future because his foster mother said that he would be unable to remain in
the current placement.  However, there
was testimony that Darren should probably not be moved to Gary’s sister in
Florida because there was a younger child in the household, and there was a
concern that Darren would continue his sexually inappropriate behavior.  Although there was no current placement plan
for Darren, his CASA representative testified that he should not be placed with
Gary because of Gary’s history of violence and criminal activity.  There was also no evidence of when Gary would
be released from prison. While in DFPS’s custody, Darren was
receiving counseling and was doing better in a structured environment than he
had been before the department took custody. 
Though he was still facing significant hurdles, the trial court could
have reasonably concluded that it was in Darren’s best interest to terminate Gary’s
parental rights.

          Jason had been living with Ms. Goins’s
daughter, Dana, even before the department placed the children in its
custody.  Dana took Jason with Lauren’s
consent when he was 18 months old because his older brothers had been abusing
him by choking him, slamming him on a bed, and tripping him on the floor.  There was evidence that at the time of trial,
Jason was in pre-kindergarten, where he was doing well.  Jason calls Dana “momma,” and Dana, a
third-grade teacher, testified that she would like to adopt Jason.  Her goal for him was to be happy, to go to
college, and to be successful.  In Dana’s
home, Jason would have significant contact with his sisters, who were being
raised by Dana’s mother.  

          Considering these factors, we conclude
that legally and factually sufficient evidence supports the trial court’s
finding that termination was in the best interest of Darren and Jason.

          We overrule Gary’s seventh issue and
Raymond’s third issue.

CONCLUSION

          We affirm the trial court’s decree terminating
Gary’s and Raymond’s parental rights.

                                                                   Sherry
Radack

                                                                   Chief
Justice 

 

Panel
consists of Chief Justice Radack and Justices Higley and Brown.

 











[1]           For purposes of this opinion, both the
parents and the children will be referred to by aliases.  See
Tex. R. App. P. 9.8.





[2]
          Tex. R. Civ. P. 105 requires that the person serving process
“shall endorse thereon the day and hour which he received it, and shall execute
and return the same without delay.”